# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: September 21, 2026

| | | |
|---|---|---|
| MARISSA NICOLE COMO, | | |
| Petitioner, | No. 18-99V | |
| v. | Special Master Young | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | | |
| Respondent. | | |

*Ronald Craig Homer*, Conway, Homer, P.C., Boston, MA, for Petitioner.
*Jay Travis Williamson*, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ENTITLEMENT[1]

On January 22, 2018, Marissa Nicole Como ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018). Pet., ECF No. 1. Petitioner alleged she suffered from small fiber neuropathy ("SFN")[2] as the result of a meningococcal vaccine she received on February 8, 2015. Am. Pet. at 1., ECF No. 55. Respondent argued against compensation, asserting that Petitioner could not establish a causation-in-fact claim by a preponderance of the evidence. Resp't's Rep. at 21, ECF No. 33.

After carefully analyzing and weighing all the evidence and testimony presented in this case in accordance with the applicable legal standards,[3] I find that Petitioner has provided

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet**. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] SFN is "a type of neuropathy in which only the small sensory cutaneous nerves are affected." *Small Fiber Neuropathy*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=137479 (hereinafter "DORLAND'S").

[3] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the Ruling will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record

preponderant evidence that the meningococcal vaccine she received on February 8, 2015, caused her to suffer from a vaccine-related injury. Accordingly, Petitioner is entitled to compensation.

## I. Procedural History

On January 22, 2018, Petitioner, acting *pro se*, filed her petition. Pet. Petitioner later obtained counsel and filed a notification of substitution on February 20, 2018. ECF No. 6. Petitioner filed medical records, an affidavit, and a statement of completion between June 25, 2018, and December 7, 2018. Pet'r's Exs. 1–9, ECF No. 10; Pet'r's Exs. 10–17, ECF No. 11; Pet'r's Ex. 18, ECF No. 12; Pet'r's Ex. 19, ECF No. 15; Pet'r's Exs. 20–21, ECF No. 18; Pet'r's Ex. 22, ECF No. 20; Pet'r's Ex. 23, ECF No. 26; Pet'r's Exs. 24–25, ECF No. 28; ECF No. 30.

On February 26, 2019, Respondent filed his Rule 4(c) report, opposing compensation. Resp't's Rep. The special master held a status conference on April 1, 2019, to discuss the issue of the onset of Petitioner's symptoms, where he ordered Petitioner to file supplementary evidence regarding onset. Min. Entry, docketed Apr. 2, 2019; ECF No. 34. Petitioner requested a fact hearing on May 16, 2019, and the special master held another status conference in response, on June 6, 2019. ECF No. 37; Min. Entry, docketed June 6, 2019. A fact hearing was tentatively scheduled and Petitioner was ordered to submit affidavits and any supplemental evidence in support of onset. ECF No. 38.

On August 23, 2019, Petitioner submitted additional evidence including text messages, contemporaneous notes and coursework, and evidence of the meningitis outbreak at Providence College. Pet'r's Ex. 26, Vol. I–IV, ECF No. 43. The special master held another status conference on September 9, 2019, where he noted the evidence submitted remained incomplete and ordered Petitioner to file additional and updated records. Min. Entry, docketed Sept. 9, 2019; ECF No. 46. Petitioner filed these records on October 10, 2019. Pet'r's Exs. 27–30, ECF No. 47. Another status conference was held on December 12, 2019, where the special master noted deficiencies in Petitioner's petition and affidavit, and ordered Petitioner to file an amended petition, additional affidavits, and any other evidence she deemed necessary. Min. Entry, docketed Dec. 12, 2019; ECF No. 51. On March 16, 2020, Petitioner filed her amended petition and a supplemental affidavit. Am. Pet; Pet'r's Ex. 31, ECF No. 56.

A Findings of Fact was issued on June 30, 2020, which found that Petitioner's symptoms began after her February 8, 2015 vaccination, and the parties were ordered to file expert reports. ECF No. 59 at 20–21. Petitioner filed an expert report from Norman Latov, M.D., Ph.D., along with his curriculum vitae ("CV") and supporting medical literature on December 18, 2020. Pet'r's Exs. 32–41, ECF No. 65; Pet'r's Exs. 42–51, ECF No. 66; Pet'r's Exs. 52–61, ECF No. 67; Pet'r's Exs. 62–71, ECF No. 68. On June 21, 2021, Respondent filed expert reports from Stephen Mark Tompkins, M.D., Ph.D., and Mark Bromberg, M.D., Ph.D., along with supporting medical

---

evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

literature. Resp't's Ex. A, Tabs 1–11, ECF No. 76; Resp't's Ex. B, Tabs 1–6, ECF No. 77.[4] Respondent filed the CVs for Dr. Tompkins and Dr. Bromberg on July 1, 2021. Resp't's Ex. C, ECF No. 80; Resp't's Ex. D, ECF No. 81.

On November 30, 2021, a Rule 5 conference was held. Min. Entry, docketed Nov. 30, 2021; ECF No. 87. Petitioner filed a supplemental expert report from Dr. Latov on February 10, 2023, along with supporting medical literature and additional medical records. Pet'r's Exs. 72–76, ECF No. 100; Pet'r's Exs. 77–94, ECF No. 101.

On July 21, 2023, an entitlement hearing was scheduled to be held on June 10–11, 2024. ECF No. 109. Petitioner filed additional medical records on March 29, 2024. Pet'r's Exs. 95–96, ECF No. 113. On April 10, 2024, Petitioner filed her pre-hearing brief, and on April 12, 2024, Petitioner filed a second supplemental expert report from Dr. Latov, as well as additional medical literature. Pet'r's Pre-Hearing Br., ECF No. 115; Pet'r's Exs. 97–120, ECF No. 116; Pet'r's Exs. 121–33, ECF No. 117. Respondent filed his pre-hearing brief on May 17, 2024, and the parties submitted their joint pre-hearing submissions on May 31, 2024. Resp't's Pre-Hearing Br., ECF No. 120; ECF No. 126. Respondent filed an updated CV for Dr. Tompkins on June 7, 2024. Resp't's Ex. E, ECF No. 131.

An entitlement hearing was held on June 10–11, 2024. Min. Entry, docketed June 13, 2024; Tr. Both parties concurrently filed post-hearing briefs on November 22, 2024. Resp't's Post-Hearing Br., ECF No. 137; Pet'r's Post-Hearing Br., ECF No. 138. This case was reassigned to me on February 25, 2026. ECF No. 141.

This matter is now ripe for consideration.

## II. Factual Background[5]

### A. Medical Records

Petitioner's pre-vaccination medical history is significant for headaches, heart palpitations, dizziness, exercise-induced asthma, and anemia. *See* Pet'r's Ex. 2 at 14, 26. On Sunday, February 8, 2015, Petitioner received the subject meningococcal B vaccine at Providence College.[6] Pet'r's Ex. 1 at 1; Pet'r's Ex. 4 at 84–85. Three days after vaccination, on Wednesday, February 11, 2015, Petitioner presented to the Providence College student health center ("SHC"), where she was seen by nurse practitioner ("NP") Cynthia Buckley. Pet'r's Ex. 4 at 28. Petitioner reported neck,

[4] The expert report of Dr. Bromberg was stricken and subsequently refiled as ECF No. 78 on June 22, 2021, due to an erroneous citation.

[5] The factual history is adopted from the Fact Ruling issued on June 30, 2020, consistent with the extent of evidence filed for consideration at the time of the Fact Ruling. All other evidence has been considered within the appropriate legal standards.

[6] In early February 2015, two individuals attending Providence College were confirmed to have the same strain of meningococcal B, but no link between the two individuals was identified. Accordingly, the school, in coordination with the state health department and the manufacturer, offered a mass vaccination clinic. Petitioner was among approximately 3,600 individuals who received the first dose of the meningococcal B vaccination on February 8, 2015. *See* Pet'r's Ex. 26, Vol. I at 45–49.

shoulder, and back pain "since Fri[day]," along with a headache, chills, and nausea that developed over the weekend. *Id.* at 28–29. Petitioner was diagnosed with a migraine and musculoskeletal neck pain, and prescribed Excedrin. *Id.* at 29. NP Buckley called Petitioner later that evening to follow up, and Petitioner reported the Excedrin had improved her headache. *Id.*

Petitioner returned to the SHC around 2:00am the following day. Pet'r's Ex. 4 at 26–27.[7] She complained of worsening neck and shoulder pain since Friday. *Id.* Handwritten notes indicated other symptoms including nausea, sweating, and anxiety. *Id.* Petitioner was concerned about the development of a rash around her ankles and scattered on her lower extremities. *Id.* NP Buckley assessed Petitioner with "musculoskeletal neck strain/viral illness." *Id.* at 27. She was given Gatorade and monitored in the sick bay of SHC until 10:30pm. *Id.*

Petitioner had an appointment with her primary care physician ("PCP"), Suzette Santos, on February 16, 2015, for a worsening stiff neck and headache. Pet'r's Ex. 2 at 13. Dr. Santos noted that Petitioner received the meningitis B vaccine but had no meningeal signs. *Id.* Dr. Santos diagnosed Petitioner with headaches and ordered a full blood test. *Id.* Her labs revealed a normal white blood cell count, elevated hemoglobin level, elevated lymphocyte level, and low segmented neutrophil level. Pet'r's Ex. 4 at 64.

Six days after the vaccination, on February 14, 2015, Petitioner presented to St. Charles Hospital Emergency Department ("ED") for "stiff muscles in neck and back and pain behind right eye." Pet'r's Ex. 6 at 4; *see also* Pet'r's Ex. 2 at 68. Petitioner and her mother expressed concern regarding a two-month history of neck and upper back pain, along with shoulder stiffness and a headache behind her right eye. Pet'r's Ex. 6 at 4. Petitioner's physical examination was normal, and she was administered Valium in the ED which "greatly resolved" her symptoms. *Id.* at 6. She was diagnosed with a muscle strain, neck strain, and tension headache. *Id.* at 7.

Petitioner's mother called Nataloni Pediatrics on February 15, 2015, February 16, 2015, and February 17, 2015, for a "follow-up from 2/12/15 visit." Pet'r's Ex. 2 at 31; *see also* Pet'r's Ex. 23 at 31B.[8] Petitioner's mother reported a "known case of meningitis," and that Petitioner had received the meningitis vaccine on February 8, 2015. Pet'r's Ex. 23 at 31B. Since the vaccine, Petitioner had a headache and stiff neck. *Id.* Initial labs were significant for elevated erythrocyte sedimentation rate ("ESR"). *Id.* Petitioner's mother reported that Petitioner's muscle tension and symptoms were 30–50% improved after taking Valium. *Id.* Petitioner's mother was advised that Petitioner should return to the SHC to rule out an adverse reaction to meningococcal vaccine, and for the health center to make a Vaccine Adverse Event Reporting System ("VAERS") report. *Id.*

A note dated February 17, 2015, and signed by Dr. Suzanne Bornschein noted that Petitioner had been seen February 11 and 12, 2015 "for what appeared to be some neck discomfort which began prior to having the vaccine." Pet'r's Ex. 4 at 23. She further noted that Petitioner's mother disclosed Petitioner's family history of Addison's, Hashimoto, and pernicious anemia and

---

[7] The handwritten portions of the record from this encounter are, in places, illegible. An interpretation of this record has been adopted from the Findings of Fact issued by the then-presiding special master on June 30, 2020. ECF No. 59.

[8] Petitioner's PCP records filed as Petitioner's Exhibit 2 contained handwritten notes. These records were refiled as Petitioner's Exhibit 23 to clarify the handwritten notes.

expressed concern about Petitioner's recent vaccination. *Id.* Dr. Bornschein consulted a Pfizer physician representative who noted that "in the early as well as the more recent large scale safety studies, there have been no associated cases of autoimmune disease." *Id.* Dr. Bornschein noted that Petitioner would "seek specialist referral from her home pediatrician." *Id.*

Petitioner was evaluated by Dr. Susan Levine on February 17, 2015, for "post-exertional fatigue, ringing in ears, stiff muscles, and some mild cognitive disturbances following receipt of the Trumenba Meningitis B vaccine on 2/7/15." Pet'r's Ex. 7 at 20. Petitioner reported symptoms between February 12–16, 2015, during which time she went home and missed classes. *Id.* After a brief reprieve, Petitioner "got sick" again and returned home on February 18, 2015. *Id.* Petitioner reported experiencing "daily fatigue, cognitive problems," and low-grade fevers and chills. *Id.* Petitioner also reported having a stiff neck, headaches, appearance of tiny purple dots, a weak feeling, ringing in her ears, and a cold sensation. *Id.* Petitioner was using methacarbamol and Flonase for chronic rhinitis. *Id.* Dr. Levine's impression was:

> The patient is a 20-year-old female who developed muscle stiffness, fatigue, headache, stiff neck and ringing in her ears within [two] days of receiving a Meningitis B vaccine. She underwent routine testing but no abnormality was noted. I will order the following: anti-peroxidase and anti-adrenal and anti-parietal serologies, ANA, TSH, HBA1c, Lyme serology and CBC with diff. I will replace her methacarbamol with Flexaril 10 mg [as needed] and prednisone 30 mg daily [for two] days followed by 25 mg daily [for two] days and continue by 5 mg decrements every two days. She will get a note for accommodation. I will perform some skin tests for chronic seasonal allergies.

*Id.* at 23–23.

On February 18, 2015, Petitioner's mother called the Providence College Student Health Services, reporting that the Petitioner was going home and Petitioner was experiencing strange sensations, and her arms and legs were feeling "hot and cold." Pet'r's Ex. 4 at 12. During this call, Petitioner's mother requested the SHC fill out a VAERS report. *Id.* A VAERS report was completed by Karen Kawa, CNP, on February 18, 2015. *Id.* at 83. The description of adverse events stated that Petitioner "presented to [Student Health Service] on 2/11/15 with [complaints of] headache/nausea since 2/8/15. Also [complained of] neck/shoulder pain since 2/6/15." *Id.* The date of vaccination and onset of adverse event was recorded as February 8, 2015. *Id.*

The labs ordered by Dr. Levine were normal aside from a high total cholesterol count. *See* Pet'r's Ex. 7 at 58–63. Dr. Levine wrote a letter dated February 20, 2015, stating that Petitioner has "an autoimmune disorder, and as a result is disabled," and requested that Petitioner be given additional time to turn in assignments and perform on examinations. Pet'r's Ex. 4 at 61. Dr. Levine requested that "accommodations to be put into place immediately and until further notice." *Id.*

Petitioner had a follow-up appointment with Dr. Levine on February 26, 2015, where Dr. Levine noted that Petitioner's labs showed elevated TGFB, and she continued to take prednisone which had "improved some of [Petitioner's] symptoms." Pet'r's Ex. 7 at 19. Dr. Levine's "Imp[ression]/Plan" was "[a]utoimmune reaction to meningococcal vaccine; will continue to taper

off of prednisone; patient has been given a letter of accommodation for school; will repeat testing in a month." *Id.*

On March 9, 2015, Petitioner had a neurology appointment with Dr. Ajay Berdia for the "chief complaint of after meningitis B vaccine developed nerve pains, shocks like feeling in all extremity, [and] dizziness episodes." Pet'r's Ex. 2 at 54. The history of present illness provided that Petitioner received a meningitis vaccine on February 7, 2015,[9] and "in 24-hours with muscle neck pain, arm pain, and she had purple dots in her legs that lasted 10 days." *Id.* Petitioner also reported "having shock pings all over, also has nerve pain," and "worming feeling," with "right leg hurting symptoms." *Id.* Petitioner complained of pain in her fingers, wrists, arm, thighs, toes, feet, face, and top of her head. *Id.* Her physical examination was normal, with no sensory deficits or abnormal reflexes. *Id.* at 59. Dr. Berdia assessed Petitioner with "likely neuropathy, autoimmune, vaccine related," and recommended that she not receive any additional booster shots. *Id.* Dr. Berdia ordered magnetic resonance imaging ("MRI") of Petitioner's brain and cervical spine as well as electromyography ("EMG")/nerve conduction study ("NCS") to rule out acute inflammatory demyelinating polyneuropathy ("AIDP"). *Id.* Dr. Berdia prescribed Petitioner a low dose of Neurontin. *Id.*

Petitioner's brain and cervical spine MRIs were normal. Pet'r's Ex. 9 at 2–3. On March 10, 2015, Petitioner reported ongoing symptoms of fatigue and tingling sensation in her extremities, cold hands and feet, and difficulty with focusing. Pet'r's Ex. 7 at 18. Dr. Levine noted that Petitioner had met with a neurologist to rule out inflammatory neuropathy. *Id.* Petitioner exhibited "diminished sensory and vibratory [responses] over both upper and lower extremities," with the rest of the examination being normal. *Id.* Dr. Levine diagnosed Petitioner with "fatigue/adverse reaction to vaccine" and wrote, "evidence in the literature that vaccine may trigger or worsen [Myalgic Encephalomyelitis/Chronic Fatigue Syndrome] symptoms; referral to neurologist." *Id.* Dr. Levine also wanted to rule out SFN. *Id.*

Petitioner's mother completed a second VAERS form on March 11, 2015. Pet'r's Ex. 15 at 1–5. This report provided that the date of vaccination was February 7, 2015,[10] with the onset of the adverse event beginning on February 8, 2015. *Id.* at 1. The "adverse event" was described as the following:

> Severe headache, severe stiff neck, chills, nausea, tiny purple dots on legs, feeling fatigued and weak, intense ringing in ears, stinging cold water (icy) spots all over body [] started on arms/legs, muscle tightness, pain in fingers/hands/wrist, toes/feet/ankles, tingling in toes/fingers, sharp stabbing pain in arms/legs/thighs. Throbbing/worming wave pain fading in and out above eyebrows, pain top of head, above left eyebrow, left temple, dizziness, episodes of extremely severe ringing in ears with feeling of going to pass out, light sensitivity and vertigo. Painful electric shocks in elbows, wrist, back of knees, fingers, extreme fatigue that doesn't go away back of neck pain. Ringing in ears that does not go away. Autoimmune autonomic neuropathy; Dizziness neck stiffness; cervical radicular pain.

[9] This is incorrect, the date of vaccination is February 8, 2015. *See* Pet'r's Ex. 1 at 1.

[10] This is incorrect, the date of vaccination is February 8, 2015. *See* Pet'r's Ex. 1 at 1.

*Id.*

Petitioner had an EMG/NCS test on March 18, 2015. Pet'r's Ex. 9 at 13. The results demonstrated "no definite evidence of a generalized demyelinating polyneuropathy," but Petitioner had "absence of bilateral peroneal F wave responses," that was of "uncertain significance in the setting of an otherwise normal study." *Id.* at 16. A repeat EMG/NCS was suggested. *Id.* Petitioner had a repeat EMG/NCS on May 7, 2015, which showed normal distal motor latency of the left median, ulnar, fibular and tibial nerves. *Id.* at 4. A sensory NCS of the left median, ulnar, superficial fibular and sural nerves showed "normal evoked responses amplitude and conduction velocity." *Id.* The "limited normal study" revealed "no electrophysiologic evidence of a focal mononeuropathy, large fiber polyneuropathy, or myopathy," but it noted that "small fiber sensory neuropathy is not assessed by these methods." *Id.*

Petitioner had a consult with neurologist, Dr. Louis Weimer, on May 7, 2015. Pet'r's Ex. 9 at 7. Petitioner reported developing headache and neck pain the day after she received the meningitis B vaccine, then three days later she developed purple dots on the top of her feet and ankles, but those resolved. *Id.* She also stated that she developed "intermittent, electric shock like pain throughout her body around this time period," and after a prednisone taper, she developed "more shock-like pain, as well as throbbing pain (particularly in her hands), severe skin sensitivity[,] and fatigue." *Id.* At this appointment, Petitioner's symptoms had stabilized but not yet improved. *Id.* She stopped taking Neurontin because it was not helping. *Id.* Petitioner's physical examination was normal, including her sensory examination. *Id.* at 8. Dr. Weimer's opinion was that Petitioner "may have had a mild case of aseptic meningitis and limited immune reaction," but he was "doubtful that she ha[d] an active or ongoing process." *Id.* at 9. He explained that Petitioner showed "no signs of significant or detectable neurological deficits or neuropathy, although a restricted [SFN] remain[ed] possible." *Id.* He offered her a trial of Cymbalta, which Petitioner declined. *Id.* Dr. Weimer recommended a skin biopsy test for evaluation of SFN, which Petitioner declined at that time. *Id.* Dr. Weimer also explained that remaining sedentary will likely make her symptoms worse and he encouraged her to resume to a normal level of activity. *Id.*

On August 17, 2015, Petitioner had a follow-up appointment with Dr. Berdia. Pet'r's Ex. 6 at 60–68. Petitioner's review of systems included "positive for activity change (more tired than usual)," and "positive for myalgias, arthralgias, neck pain, and neck stiffness." *Id.* at 62. Dr. Berdia's assessment remained unchanged from the initial appointment on March 9, 2015, including recommending that Petitioner obtain MRIs and EMG/NCS. *Id.* at 63. There was one addition on August 17, 2015, noting that Petitioner saw Dr. Weimer for SFN. *Id.*

During an appointment with Dr. Levine on August 20, 2015, Petitioner reported having a "considerable setback of symptoms," and that she "has likely aseptic meningitis." Pet'r's Ex. 7 at 16. Petitioner was experiencing muscle pain, unrefreshing sleep, short term memory loss, and diminished concentration. *Id.* Dr. Levine's plan was to "continue to taper off of prednisone." *Id.* Dr. Levine ordered testing that was mostly normal, except Petitioner had elevated HHV antibodies and Coxsackie A IgG/IgM antibodies. *Id.* at 51.

On November 4, 2015, Petitioner sought care at the SHC for fever, nasal congestion, sore throat, and neck pain. Pet'r's Ex. 4 at 21–22. The record from this date noted that Petitioner had

"aseptic meningitis from vaccine," "[SFN]/fatigue," and "chronic coxsackie." *Id.* at 21. A throat culture was taken and negative for strep. *Id.* at 58. Six days later, Petitioner returned to the SHC reporting swollen glands and a continued sore throat. *Id.* at 19–20. She was assessed with an upper respiratory infection and labs taken ruled out Epstein-Barr virus ("EBV"). *Id.* at 20, 55–57.

Petitioner had an optometry evaluation with Dr. Kenneith Sorkin on December 22, 2015. Pet'r's Ex. 2 at 53; Pet'r's Ex. 20 at 1. Petitioner reported no vision complaints but did have nerve pain in her head every two to three days. Pet'r's Ex. 20 at 1. Petitioner's vision examination was positive for "mild myopia without distance vision complaint," with everything else normal. *Id.*

Between January 2016 and May 2016, Petitioner had follow-up appointments with both Dr. Berdia and Dr. Levine. *See* Pet'r's Exs. 6 at 71–74; Pet'r's Ex. 7 at 14–15. The appointment notes and assessments by the treating providers are nearly identical to prior appointments. *See, e.g.*, Pet'r's Ex. 7 at 15.

On May 27, 2016, Petitioner had a follow-up appointment with Dr. Levine. Pet'r's Ex. 7 at 13. After reviewing updated labs, Dr. Levine diagnosed Petitioner with chronic fatigue syndrome, writing that Petitioner "meets criteria for this disease; elevated HHV-6 serologies as well as evidence of prior exposure to Coxsackie viruses; on cure." *Id.* Dr. Levine also included a notation for SFN and noted that she "will review report from Dr. Weimer likely related to vaccine exposure." *Id.* Additional labs ordered on August 18, 2016, showed Petitioner had slightly elevated liver function tests, high IgG antibody levels for Coxsackie A7, A9, A16, and A24, and negative for Coxsackie virus group B antibodies, except for an elevated B-5 antibody. *Id.* at 40–42. Petitioner's HHV-6 IgG antibodies were elevated, but HHV-6 IgM antibodies were negative. *Id.* at 43–44.

On August 20, 2016, Petitioner had an appointment at Nataloni Pediatrics for a two-day fever at 100.6 degrees, swollen glands, and fatigue for two months. Pet'r's Ex. 2 at 3. Labs were ordered, which were positive for elevated C-reactive protein, elevated liver tests, and reactive lymphocytes. *Id.* at 42. Additionally, Petitioner was positive for EBV IgM, suggestive of an ongoing EBV infection. *Id.* An ultrasound of Petitioner's spleen revealed "mild splenomegaly." *Id.* at 39. Five days later, Petitioner had an appointment with Dr. Levine who noted that Petitioner had "developed elevated [liver function tests] in the last few days" and a positive EBV IgM and reactive lymphocytes on blood smear. *Id.* at 11. Dr. Levine assessed Petitioner again with chronic fatigue syndrome and "Hepatitis: [consistent with] acute [mononucleosis ("mono")]; [follow-up] serologies." *Id.*

Dr. Santos wrote a "To Whom It May Concern" letter dated September 1, 2016, stating that Petitioner was being treated for mono and requested that Petitioner be excused for any absences from class. Pet'r's Ex. 4 at 9. Petitioner had an appointment with her pediatrician on October 10, 2016, for fatigue and "concerns about possible Addison's disease." Pet'r's Ex. 2 at 2. The record noted that Petitioner was diagnosed with mono in August. *Id.* Petitioner reported not being able to get an appointment with an endocrinologist until December, and Petitioner's mother requested additional blood work. *Id.*

On November 23, 2016, Petitioner had an appointment with endocrinologist, Dr. Deepa Aravind for "low cortisol." Pet'r's Ex. 12 at 11–12. Petitioner's history of present illness from this appointment noted that she "was recently diagnosed with history of infectious mono[] and had cortisol done which was low. Patient's mother with Addison's disease and since patient was diagnosed with significant fatigue. Fatigue since Feb. 2015 when she got a vaccine for meningitis B but developed aseptic meningitis." *Id.* Petitioner reported that the fatigue occurred throughout the day, and she slept a lot and well at night. *Id.*

Dr. Aravind assessed Petitioner with "abnormal results of other endocrine function studies" and ordered additional labs. Pet'r's Ex. 12 at 12. Additionally, Dr. Aravind wrote, "Patient with fatigue at such a young age likely multifactorial with aseptic meningitis and mono playing a role." *Id.* The plan was to do additional labs and follow up in four weeks. *Id.* The labs were normal, including thyroid function and cortisol levels. *Id.* at 6–9. Dr. Aravind's addendum to the record after Petitioner's lab results stated, "[h]ormonal work up normal . . . Does not need cortisol stimulation test . . . Also does not have adrenal insufficiency." *Id.* at 12.

On December 28, 2016, Petitioner was seen by Dr. Levine. Pet'r's Ex. 7 at 9. Dr. Levine noted that Petitioner's liver function returned to normal, but Petitioner was complaining of extreme weakness and feeling rundown with "daily episodes of [post-exertional malaise] after even minimal exertion." *Id.* Petitioner also reported headaches that were unresponsive to over-the-counter medication and lightheadedness and "near syncope" after standing for long periods of time. *Id.* Dr. Levine's "Impression/Plan" remained unchanged from previous appointments, and she ordered more testing. *See, e.g.*, *id.* at 10, 11.

When Petitioner returned to Dr. Levine on February 15, 2017, she reported daily fatigue, headaches, tingling and burning sensations in her skin, and "blood pressure findings compatible with orthostatic intolerance or '[Postural Orthostatic Tachycardia Syndrome' ("POTS")]." Pet'r's Ex. 7 at 8. Dr. Levine's Impression/Plan for this appointment was:

> Chronic Fatigue Syndrome: elevated serologies to EBV and HHV-6 in addition to meeting clinical criteria for this disease. [POTS]: referral to cardiologist; [SFN]: [follow-up] with neurologist; Hepatitis: [consistent with] acute mono; [follow-up] serologies; Low cortisol: suggest [follow up] with endocrinologist.

*Id.*

On May 27, 2017, Petitioner had a follow-up visit with neurologist Dr. Berdia. Pet'r's Ex. 2 at 33–35; Pet'r's Ex. 6 at 82–86. Petitioner had a normal physical examination. *Id.* He assessed Petitioner with "likely neuropathy autoimmune, vaccine related and [SFN]. She likely also had aseptic meningitis at the onset of her vaccine." Pet'r's Ex. 6 at 86. He carried forward the same language regarding obtaining a brain and cervical spine MRI, and EMG/NCS. *Id.* He also wrote, "[Petitioner] does have low IgA which . . . likely prevents her from receiving IVIG? Consider Rituxan. She will see Dr. Weimer and discuss in detail." *Id.*

On August 27, 2017, Petitioner had an appointment at Weill Cornell Medicine with neurologist Dr. Russell Chin. Pet'r's Ex. 13 at 1. The record noted that Petitioner, "[w]ithin 24

[hours of vaccination], recall[ed] developing neck stiffness and severe headache, followed later by paresthesias throughout her body, chills, fatigue and dizziness." *Id.* Her symptoms progressed and at 36 hours post-vaccination, "she developed skin lesions (flat, punctate, purplish dots) to her extremities and back [that] resolved after [one to two] weeks." *Id.* Petitioner's physical examination was normal, including sensory and neurological results. *Id.* at 3–4.

Dr. Chin reviewed Petitioner's MRIs and labs from different dates including February 2015, March 2015, and May 2015. Pet'r's Ex. 13 at 4. Dr. Chin "suspected [SFN] given sensory symptoms and diffuse distribution" and considered "post-vaccination, inflammatory etiology?" *Id.* at 5. Dr. Chin recommended a skin biopsy and lumbar puncture. *Id.* Petitioner had a skin biopsy taken from two locations, her right thigh and right calf. Pet'r's Ex. 19 at 1. The sample from her right thigh was normal in both Sweat Gland Nerve Fiber Density and Epidermal Nerve Fiber Density, however, the sample from her right calf showed "skin with significantly reduced Sweat Gland Nerve Fiber density consistent with [SFN]," and the Epidermal Nerve Fiber Density result was "low normal." *Id.* at 2–3.

Dr. Chin emailed Petitioner on December 20, 2017, and reported that her "findings were only minimally abnormal with a low normal density of small nerve fibers in the biopsy from the calf and a normal amount in the biopsy from the thigh." Pet'r's Ex. 19 at 5. He also reported that "in the right calf sample, there was a reduction in the nerve fibers supplying the sweat glands in that piece of skin." *Id.* Dr. Chin told Petitioner that "[t]hese findings can support a '[SFN]' diagnosis, but the biopsies couldn't give us more information about the exact cause." *Id.*

Petitioner had an appointment with Dr. Levine on December 22, 2017. Pet'r's Ex. 72 at 209. Petitioner reported daily fatigue, tingling and numbness, and loss of motor strength in both her upper and lower extremities. *Id.* Dr. Levine's record stated that Petitioner's "biopsy [wa]s consistent with [SFN]," and she wanted to order additional testing, including a tilt table test and spinal fluid analysis. *Id.* The physical examination noted that Petitioner had "slight loss of sensory/vibration activity in both L5/S1 dermatomes of lower extremities," and she had a positive Romberg sign. *Id.*

On January 18, 2018, Dr. Chin emailed Petitioner to ask how she was doing and reported that her spinal tap came back normal, including protein levels. Pet'r's Ex. 75 at 13. Petitioner responded that she was still experiencing nerve pain and fatigue and requested a copy of the skin biopsy and spinal tap results. *Id.*

Between February 2018 and August 2018, Petitioner continued to be treated by Dr. Levine for chronic fatigue and diminished sensory activity in both legs. *See* Pet'r's Ex. 72 at 208–20.

On February 26, 2020, Petitioner had an appointment with Dr. Joshua Weaver for neuropathy. Pet'r's Ex. 75 at 9. She reported bilateral shoulder cramps. *Id.* Dr. Weaver observed a slight curvature in Petitioner's thoracic spine, but her sensory response was intact, and she had negative Romberg signs. *Id.* at 11. He recounted her history of "aseptic meningitis after meningococcal B vaccine and subsequent chronic fatigue and [SFN]." *Id.* at 11. Dr. Weaver noted that connective tissue disorder (e.g. Ehlers-Danlos type) can be associated with SFN and recommended a scoliosis series X-ray to evaluate for possible scoliosis. *Id.*

An X-ray of Petitioner's spine showed 13 degrees dextroscoliosis in the thoracic spine and 25 degrees rotatory levoscoliosis in her thoracolumbar spine. Pet'r's Ex. 73 at 7. Dr. Weaver reviewed Petitioner's X-ray and recommended physical therapy, yoga, "and observation for now." Pet'r's Ex. 75 at 12.

On February 19, 2020, Petitioner had an appointment with Orthopedic Association of Long Island Physicians for an evaluation of "low back discomfort" and her recent diagnosis of thoracolumbar scoliosis. Pet'r's Ex. 74 at 6. Petitioner disclosed a positive prior history for peripheral neuropathy from a meningococcal vaccination, which resulted in aseptic meningitis. *Id.*

Petitioner's lumbar spine examination showed "left asymmetry at the thoracolumbar junction," and she had restricted range of motion in all directions secondary to pain. Pet'r's Ex. 74 at 6. Petitioner's sensation was recorded as "grossly intact to light touch in all dermatomes," and she had "moderate bilateral hypertonicity and tenderness of the paraspinal lumbar musculature." *Id.* Dr. Lanzone wrote that Petitioner's thoracolumbar scoliosis was of "unclear etiology," and he "discussed the natural history of scoliosis at length" with Petitioner and her mother. *Id.*

## III. Affidavits

Petitioner submitted a personal statement and affidavits from a friend of Petitioner, Ms. Gabrielle Shkreli; a professor, Mr. James Tattersall; and Petitioner's mother, Ms. Ann Como. *See generally* Pet'r's Ex. 27. These statements were all considered in contemplation of the Fact Ruling.

### A. Petitioner's Affidavit/Statement

Petitioner executed two personal statements, dated September 22, 2019, and October 9, 2019, prior to submitting her affidavit, executed on March 13, 2020. *See* Pet'r's Ex. 27 at 1–4; Pet'r Ex. 31. In the first personal statement executed on September 22, 2019, Petitioner stated that prior to the meningitis vaccine she was "in perfect health." Pet'r's Ex. 27 at 1. She acknowledged that some of the dates of vaccination were incorrectly recorded by Dr. Levine and her mother, and that the correct date of vaccination was February 8, 2015. *Id.* She explained that "after the vaccine, [she] was so sick [she] couldn't think." *Id.* She described having the "worst headache" of her life and cognitive issues that affected her ability to report the correct date of vaccination. *Id.*

She stated that the notes from her February 11, 2015 appointment incorrectly documented neck pain beginning on Friday and she did not have any neck pain "prior to the vaccination." Pet'r's Ex. 27 at 1. Petitioner stated that the record from this appointment stated that she had been feeling ill for "5/2–3 days," which would put her neck pain beginning on February 7, 2015, the day prior to vaccination. *Id.* She asserted that due to the cognitive issues she was experiencing at the time, she must have thought the vaccination was on February 7, 2015. *Id.* Petitioner stated, "[a]t no point did [she] experience neck pain prior to the vaccination," and that her medical records prior to vaccination do not document any neck pain prior to the meningitis vaccination. *Id.*

Petitioner also stated that the medical record from her February 14, 2015 ED "History of Present Illness" also incorrectly documented that she had reported headaches and neck stiffness

for two months. Pet'r's Ex. 27 at 1. Petitioner observed that the "Chief Complaint" section correctly documented that her neck pain had been occurring for one week. *Id.* Petitioner asserted that she also mentioned the vaccination multiple times without it being documented. *Id.*

Then Petitioner asserted that the letter from Dr. Bornschein, the SHC's physician, included inaccurate information about how Petitioner was feeling. Pet'r's Ex. 27 at 2. Specifically, Petitioner stated that she did not have an appointment with Dr. Bornschein on February 17, 2015, and that she did not tell Dr. Bornschein that she was "feeling no headache, reports no visual changes," or that she was sleeping well. *Id.*; *see also* Pet'r's Ex. 4 at 24. Petitioner stated that she did not feel fine during this time, but instead, she was extremely ill, which is supported by the various medical appointments she had during this time. Pet'r's Ex. 27 at 2.

Petitioner concluded the September 22, 2019 statement stating that she is "unable to live a normal life because of this vaccine," and that she cannot "go through a whole day without needing a nap." Pet'r's Ex. 27 at 2.

The second personal statement, executed on October 9, 2019, further explained the symptoms Petitioner was experiencing. Pet'r's Ex. 27 at 3. At the time of this statement, Petitioner asserted she was experiencing daily nerve pain, including stinging, burning, stabbing, pins and needles, and fatigue. *Id.* Petitioner stated that the "extreme fatigue" she had experienced since the meningitis vaccine has affected her ability to be physically active and she can no longer exercise. *Id.* Additionally, she stated that "around July 2019," she "discovered that [her] abdomen and back looked crooked and sideways." *Id.* She asserted that she had never had scoliosis. *Id.* Petitioner then explained how her SFN and associated fatigue, caused by the meningitis vaccine, led to weak core muscles, which caused her pelvis to become misaligned. *Id.* She asserted that as a result of this "misalignment," her "whole body looks sideways." *Id.*

Petitioner stated that she was continuing physical therapy and waiting to get additional spinal X-rays. Pet'r's Ex. 27 at 4. She asserted that due to her body appearing "sideways," she was experiencing other health issues, such as backpain and lung pressure. *Id.* Petitioner expressed concern that the "existing [SFN]" was causing other health complications, such as a degenerative muscular problem. *Id.*

The affidavit Petitioner executed on March 13, 2020, provided a detailed history of her schedule three days prior to the vaccination. Pet'r's Ex. 31 at ¶¶ 1–10. The day prior to receiving the meningitis vaccine, Petitioner attended a meningitis information session hosted by the Rhode Island Department of Health due to the confirmed cases of meningitis at the college. *Id.* at ¶¶ 10–11. Later in the day following her vaccination, on February 8, 2015, Petitioner's left arm hurt more than after previous vaccinations, and many students on campus were complaining of arm pain post-vaccination. *Id.* at ¶ 12. That evening, Petitioner was fatigued and had a slight headache. *Id.* The following day, February 9, 2015, Petitioner stated she was exhausted, had a headache all around her head and in her eyes, and was lightheaded. *Id.* at ¶ 14. Petitioner walked with her friend to the SHC and spoke to a nurse about how she was feeling; however, she was told to go back to her dorm because "the staff was so busy with students feeling sick from the vaccine." *Id.* On February 10, 2015, Petitioner did not attend classes because she felt "sluggish and bad," and she still had a headache that had gotten worse. *Id.* at ¶ 15. Petitioner stated that her "neck started to

feel extremely tense." *Id.* at ¶ 16. She stated the "spinal cord, right where it went into the back of [her] neck, felt bruised." *Id.*

On February 11, 2015, Petitioner felt awful. Pet'r's Ex. 31 at ¶ 17. Her neck and shoulder muscles were tight, she felt fatigued, and her headache had gotten worse. *Id.* Petitioner decided to go to the SHC due to the pain and nausea she experienced. *Id.* at ¶ 18. Petitioner stated that she was having difficulty explaining her symptoms, due to the nature of the headache, body aches, and heart racing. *Id.* at ¶ 19. Petitioner again disputed the timeframe and onset of her condition as recorded at the appointment on February 11, 2015 (recorded onset as Friday February 6, 2015, or Saturday, February 7, 2015). *Id.* at ¶ 20. Petitioner remained at SHC until approximately 10:30pm on February 11, 2015, when she was taken back to her dorm. *Id.* at 20–21.

During the early hours of February 12, 2015, Petitioner returned to the SHC because she noticed "small and large light purple dots on [her] feet." Pet'r's Ex. 31 at ¶ 24. Petitioner called her parents to pick her up from school the same day. *Id.* at ¶ 25. Petitioner described her ongoing pain as agonizing and noted that her neck stiffness was getting worse. *Id.* at ¶ 28. She stated she had a "low-grade fever of 98.4" degrees, even though she had taken Tylenol for her severe headache. *Id.*

Petitioner explained that between February 12–14, 2015, she was experiencing chills, headache, and was in unbearable pain. Pet'r's Ex. 31 at ¶¶ 28–29. Petitioner stated that she began to hear high pitched ringing in her ears on February 14, 2015, and she was still experiencing such ringing on the day she executed the affidavit. *Id.* at ¶ 29. She was brought to the ED because of the new symptoms of tinnitus and extremely painful headache. *Id.* Petitioner stated that she felt so weak while in the ED that she was unable to form the correct string of events. *Id.* Again, Petitioner asserted that the ED physician incorrectly recorded onset and progression of her symptoms. *Id.* at ¶ 32. Petitioner stated that her symptoms, "slowly built into an unbearable pain, and that was why [she] was in the [ED]." *Id.* She also stated, "[s]pecifically, the horrible symptoms reached an unbearable threshold the evening of Wednesday, February 11, 2015, into Thursday, February 12, 2015. [She] had [her] dad pick [her] up the morning of February 12th, three days post-vaccination. This unbearable pain continued for weeks." *Id.* Petitioner did not testify at the entitlement hearing.

### B. Statement of Gabrielle Shkreli

Petitioner submitted a statement from her friend, Gabrielle Shkreli, which was executed on September 25, 2019. Pet'r's Ex. 27 at 5–6. Ms. Shkreli stated that she became friends with Petitioner during their sophomore year at Providence College. *Id.* Ms. Shkreli stated that her birthday is February 9, and she celebrated her birthday the weekend of February 6–8. *Id.* Ms. Shkreli and Petitioner went to another dorm the night of Friday, February 6, 2015, and returned in the early morning after having "a good time with friends." *Id.* Ms. Shkreli stated that Petitioner received the meningitis vaccine on February 8, 2015, and after that vaccination, she "saw a change in [Petitioner]." *Id.* She asserted that Petitioner was complaining that she did not feel right or that she was really tired since she received the vaccine. *Id.* Ms. Shkreli stated that Petitioner began to miss classes due to medical appointments to "figure out why her body was acting so strangely, why she was dealing with so much fatigue and illness." *Id.*

Ms. Shkreli stated that in 2016, she became roommates with Petitioner and that is "when [she] really noticed a change." Pet'r's Ex. 27 at 5–6. She asserted that Petitioner needed a special air conditioning unit due to her condition. *Id.* Additionally, Ms. Shkreli would find Petitioner "knocked out from exhaustion" in the middle of the day. *Id.* Ms. Shkreli also observed that Petitioner's "senses in her body had changed," and Petitioner would touch hot surfaces without flinching. *Id.* Ms. Shkreli recalled that Petitioner once told her "how the tips of her fingers had lost the sensitivity they once had." *Id.*

Ms. Shkreli stated that her friendship with Petitioner changed, because Petitioner's numerous doctor's appointments and need for rest allowed for less time spent with friends. Pet'r's Ex. 27 at 6. Ms. Shkreli stated that it was difficult to see her friend go through so much pain. *Id.*

### C. Statement of James T. Tattersall, Ph.D.

Petitioner submitted a statement from James Tattersall, a Professor of Mathematics at Providence College, who was Petitioner's professor in two courses. Pet'r's Ex. 27 at 7. Mr. Tattersall stated that Petitioner was an excellent student in the Foundations of Mathematics Class in Spring 2015. *Id.* He stated that "[i]n February 2015, there was definitely a noticeable change in [Petitioner's] performance in class," and reported she received a 97.5% on her first exam and an 81.25% on the second. *Id.* Mr. Tattersall stated that after turning in homework assignments in January and early February 2015, she did not turn in any further assignments. *Id.* He stated, "[t]his was uncharacteristic of her as a student." *Id.* Mr. Tattersall wrote that Petitioner was doing "excellent" in the Foundation of Mathematics class, but Petitioner "took a turn for the worse after receiving the vaccine in February 2015." *Id.*

### D. Statement of Ann Como

Petitioner's mother, Ann Como, also submitted a personal statement that was executed on September 22, 2019. Pet'r's Ex. 27 at 9. Ms. Como stated that Petitioner was an active, vibrant child who received a full academic scholarship to Providence College. *Id.* She stated that Petitioner was engaged in many extracurricular activities, including cross country, badminton, and flute. *Id.* She stated that Petitioner's life "drastically" changed after receiving the meningitis vaccine. *Id.* At the time the statement was executed, Petitioner was "barely able to function and plan[ned] her day around having to rest and sleep." *Id.* Ms. Como stated that Petitioner was in constant pain and fatigue, and she struggled to stay in school and complete her college degree. *Id.* Ms. Como stated that Petitioner felt isolated from her friends because they did not understand her chronic illness. *Id.*

## IV. Fact Ruling

On June 30, 2020, the then presiding special master issued a Findings of Fact ("Fact Ruling") in this case "based on the existing record, without need for a hearing." ECF No. 59 at 1. The medical records, which have been summarized in this Ruling, as well as the affidavits and statements of Petitioner and her witnesses, were considered by the special master in reaching his

conclusions.[11] Additionally, Petitioner filed other evidence regarding onset that "was organized into four volumes: (I) campus climate at Providence College during the meningitis outbreak in 2015; (II) Petitioner's contemporaneous coursework during the meningitis outbreak in 2015; (III) her social events from February 6–8, 2015; and (IV) personal statements." *Id.* at 3. The special master ultimately found "that the onset of Petitioner's symptoms was shortly after the vaccination." *Id.* at 1. Additionally, the special master "noted that multiple treating physicians recorded that there may be a causal association between the meningococcal B vaccination and Petitioner's subsequent symptoms." *Id.* at 21. The Fact Ruling clarified that "certain medical records suggest that after receiving the vaccination, Petitioner developed aseptic meningitis. Chronic fatigue syndrome was also suspected." *Id.*

The Fact Ruling included the following timeline for Petitioner's initial clinical presentation:

> Petitioner was in good health upon receiving the meningococcal B vaccination on Sunday, February 8, 2015 at 1:13 p.m. That evening, she developed pain and difficulty moving her left arm, in which the vaccine was administered; fatigue; chills; and a slight headache. Throughout February 9, 2015 and February 10, 2015, these symptoms increased and she also developed neck and shoulder pain and general body aches. On February 11, 2015, these symptoms increased further and she also developed nausea and dizziness, prompting Petitioner's presentation to the student health center at about approximately 3:00 p.m. By February 12, 2015 at 2:00 a.m., Petitioner developed a rash, described as tiny purple dots, on her lower extremities and back, which resolved within a few days. By February 14, 2015, she developed a ringing in her ears which was diagnosed as tinnitus.

ECF No. 59 at 20. Petitioner was also found to have been "in good health before receiving the vaccination." *Id.* at 18.

## V. Experts

### A. Expert Qualifications

#### 1. Petitioner's Expert, Norman Latov, M.D., Ph.D.

Dr. Latov is a board-certified neurologist and psychiatrist, who earned his medical degree from the University of Pennsylvania in 1975. Pet'r's Ex. 33 at 2. He completed his residency in neurology at Columbia Presbyterian Medical Center and became an attending neurologist in 1981 at Presbyterian Hospital in New York City. *Id.* Dr. Latov remains an attending neurologist at New York Presbyterian Hospital in New York. *Id.* at 3. He completed a post-doctoral research fellowship

---

[11] Petitioner filed additional statements from witnesses that provided evidence specifically related to Petitioner's onset. This evidence was detailed by the presiding special master and relied on by him in this Fact Ruling. I have not included in this Ruling those accounts or the summaries of other evidence "regarding onset." ECF No. 59 at 3. This Ruling is, however, consistent with the aforementioned findings of fact rendered in the case, as the experts obtained by both parties relied on such findings to render their opinions with respect to vaccination causation.

in 1981 in immunology. *Id.* In 1981, he became an Assistant Professor of Neurology at Columbia University in New York City, New York. *Id.* In 1994, he obtained full professorship and continues to teach neurology at Columbia University presently. *Id.* Dr. Latov was the director of the Peripheral Neuropathy/Immunology Laboratory. Tr. 6: 1. Dr. Latov was an editorial board member of the Journal of Peripheral Nervous System between 2001–2007 and is currently an editorial board member of BMC Neurology. Pet'r's Ex. 33 at 3. He is listed on three patents for treating neuropathy. *Id.* Additionally, he is a named author on numerous peer reviewed journal articles on different topics in neurology. *Id.* at 3–15; Tr. 6: 9–11. Dr. Latov is a member of the Academy of Neurology. Tr. 6: 18–19. He testified that he has treated several hundred patients with Guillain-Barré syndrome ("GBS") throughout his career and a "couple of hundred" patients with SFN. Tr. 6: 14–19. Dr. Latov was admitted as expert in neurology and immunology. Tr. 8: 2–3.

**2. Respondent's Experts**

**a. Mark B. Bromberg, M.D., Ph.D.**

Dr. Mark Bromberg is a board-certified neurologist who earned his medical degree from University of Michigan in 1982. Resp't's Ex. D at 1. He completed his residency at the University of Michigan Medical Center in the Department of Neurology and was a neuromuscular fellow in the Department of Neurology and Physical Medicine at the same medical center. *Id.* Dr. Bromberg was an assistant professor in the neurology department at the University of Michigan between 1977–1994. *Id.* In 1994, Dr. Bromberg became a visiting associate professor at the University of Utah Health Sciences Center and remained at the University of Utah Health Sciences Center teaching in the neurology department. *Id.* Dr. Bromberg stated that he was recruited to the University of Utah to formalize an EMG laboratory and neuromuscular program. Tr. 179: 14–17. He has served on the editorial board of Muscle & Nerve and the Journal of Clinical Neuromuscular Disease. Resp't's Ex. D at 2. Dr. Bromberg is licensed to practice medicine in Utah and Wyoming. *Id.* at 6. Additionally, he has authored or co-authored numerous medical articles on various topics associated with neurology, including chronic inflammatory demyelinating polyradiculoneuropathy and electrodiagnostic testing. *Id.* at 19–43. Dr. Bromberg was admitted as an expert in the field of neurology and electrodiagnostic testing. Tr. 184: 21–23.

**b. S. Mark Tompkins, Ph.D.**

Dr. Tompkins has a Ph.D. in the field of immunology and molecular pathogenesis. Resp't's Ex. A at 1; Resp't's Ex. C. Dr. Tompkins received his Ph.D. from Emory University in 1997. Resp't's Ex. C at 1. He completed his post-doctoral training in immunology in 2002 at Northwestern University Medical School in Chicago, Illinois, and virology/immunology post-doctoral training in 2005 at CBER/FDA in Bethesda, Maryland. *Id.* Dr. Tompkins became an assistant professor in the Department of Infectious Diseases at the University of Georgia's College of Veterinary Medicine in 2005. *Id.* at 2. He became a tenured professor in 2010. *Id.* In 2016, Dr. Tompkins became a full professor and full member at the Center for Vaccines and Immunology at the College of Veterinary Medicine at the University of Georgia. *Id.* at 2. Dr. Tompkins is a member of several organizations. *Id.* at 6–7. He has participated as an editorial board member on several medical journals, including the Journal of Virology and Journal of Medical Microbiology. *Id.* at 4. Dr. Tompkins has been the principal investigator on multiple grants. *Id.* at 17–20. Dr. Tompkins

testified that as the director of the Center for Vaccines and Immunology at the University of Georgia, he has both administrative and clinical research responsibilities. Tr. 193: 14–15; 19-22. He has published between 110 and 120 peer-reviewed articles, mostly "around immunological or vaccine development," or "viral pathogenesis." Tr. 202: 8–12. Dr. Tompkins was admitted as an expert in the field of immunology, molecular pathogenesis, and vaccinology. Tr. 204: 5–6.

### 3. Expert Reports and Testimony

#### a. Dr. Latov

Dr. Latov submitted three expert reports and testified during the entitlement hearing. Pet'r's Exs. 32, 77, 97; Tr. 3. He opined "with a reasonable degree of medical certainty . . . that [Petitioner] developed acute onset [SFN] as a consequence of having received the Trumenba vaccine on February 8, 2015." Pet'r's Ex. 32 at 6; Tr. 8: 12–15.

##### i. Diagnosis

Dr. Latov stated that SFN is an autoimmune condition, and some physicians believe it to be a variant of GBS. Pet'r's Ex. 32 at 3–2; Tr. 14: 1–4. He stated that small fiber neuropathies "can be length dependent or primarily affecting the legs and then the hands, or non-length dependent, in which they can be multifocal or diffuse." Pet'r's Ex. 77 at 1. During the hearing, Dr. Latov referred to an article by Makonahalli et al.[12], which described SFN as a variant of GBS. Tr. 15: 18–23; Pet'r's Ex. 50. Makonahalli et al., describing another article, stated, "[r]ecently an attempt has been made to classify the sensory variants of GBS. The authors have proposed [three] types: acute sensory demyelinating neuropathy, acute large fiber axonopathy and ganglionopathy, and acute [SFN] and ganglionopathy." Pet'r's Ex. 50 at 3. Makonahalli et al. classified their patient as "acute [SFN] and ganglionopathy," because their patient had "features of small fiber dysfunction and orthostatic symptoms." *Id.* at 4. Dr. Latov testified that ganglionopathy is a "subcategory of neuropathy," and that it primarily affects the ganglia, which results in signs and symptoms in "distribution of the nerves emanating from the ganglia, which can occur anywhere in the body -- face, torso, arms, and legs." Tr. 16: 17–18; Tr. 17: 2–8. He stated that Makonahalli et al. was attempting to classify neuropathies "according to whether they're distal or kind of diffuse." Tr. 17: 9–11. More specifically, if the signs and symptoms are primarily on the face and torso, in addition to the legs, they are "presumed to be due to involvement of the dorsoganglia." Tr. 17: 12–15.

Dr. Latov also referred to the Uncini & Yuki[13] article to support his opinion that SFN may be related to GBS and described the different types of presentations. Pet'r's Ex. 66. Uncini & Yuki defined sensory GBS as "an acute, monophasic, widespread neuropathy characterized clinically by exclusive sensory symptoms and signs that reach their nadir in [six] weeks without related systemic disorders, other diseases, or conditions known to be associated with an acute sensory peripheral neuropathy." *Id.* at 1. The authors developed three classifications: 1) acute sensory

[12] Rohita Makonahalli et al., *Acute Small Fiber Neuropathy Following Mycoplasma Infection: A Rare Variant of Guillain-Barré Syndrome*, 15 J. CLINICAL NEUROMUSCULAR DISEASE 147 (2014).
[13] Antonio Uncini & Nobuhiro Yuki, *Sensory Guillain-Barré Syndrome and Related Disorders: An Attempt at Systematization*, 45 MUSCLE &NERVE 464 (2012).

large-fiber demyelinating polyneuropathy; 2) acute sensory axonopathy-ganglionopathy; and 3) acute sensory SFN-ganglionopathy. *Id.* at 2. Uncini & Yuki stated that for cases identified under the classification of "acute sensory [SFN]/ganglionopathy," symptoms included acute onset of numbness and/or burning sensation and pain in the extremities, with physical examinations showing normal strength, but distal sensory loss for pain and temperature. *Id.* at 4. Quantitative sensory testing demonstrated elevated thermal thresholds for warm sensation and reduced threshold for cold induced pain, and motor and sensory nerve conduction studies were normal. *Id.* Skin biopsies in four out of 10 patients demonstrated "severe dermal small-fiber denervation." *Id.* Dr. Latov testified that Uncini & Yuki was exemplary of how difficult it can be diagnosing patients with a "purely sensory neuropathy." Tr. 19: 1–2.

A second article, written five years after Dr. Yuki co-authored the previously discussed article, was also filed by Dr. Latov. Pet'r's Ex. 70.[14] It described three patients with SFN "weeks after a preceding infectious illness." *Id.* at 1. All three patients presented with impaired pinprick sensation, brush allodynia in a stocking-glove distribution, autonomic symptoms, normal NCS testing of their bilateral median, ulnar, peroneal, tibial sensory, and motor nerves, normal CSF, and decreased or absent deep tendon reflexes. *Id.* at 1–2. The authors opined that the reduced reflexes "were likely a result of the spinal root inflammation common to [GBS] and its variants such as Fisher Syndrome." *Id.* at 4. In comparing their cases to the literature, the authors noted that "[s]ome authors have used the term acute [SFN] to describe these patients and have proposed this as another variant of [GBS]." *Id.* However, they cautioned that "[t]raditionally, [GBS] is a neuropathy restricted to the large motor-sensory fibers, divided into demyelinating and axonal forms." *Id.* Given this distinction, the authors opined that such cases of acute SFN may "exhibit similarities to [GBS]," but that "[a] factor outside of the scope of traditional [GBS] would be the positive response to corticosteroids." *Id.* at 4–5. The authors concluded by suggesting that acute SFN was "a different disease entity" from GBS due to the fact that not all patients with acute SFN following infection or vaccination complain of pain." *Id.* at 5.

Dr. Latov stated that neurological examinations are "frequently normal in [SFN]," and EMG and NCS tests are also insensitive to identifying SFN. Pet'r's Ex. 77 at 2. Referencing the Herrmann et al.[15] article, Dr. Latov stated that "only 53.7% of their patients with [SFN] had abnormal pin prick examination, and none had abnormal vibratory sensation, position sense or absent deep tendon reflexes." *Id.* (citing Pet'r's Ex. 84 at 3). However, abnormal tendon reflexes or proprioception were exclusionary criteria in the Herrmann et al. study of SFN. Pet'r's Ex. 84 at 2. The Devigili et al.[16] study, which Dr. Latov also referenced to support his opinion that reduced pin prick sensation is not equal among SFN patients, found that pinprick evoked pain in 37.7% of patients. Pet'r's Ex. 39 at 7. Devigili et al. sought to identify specificity and sensitivity of clinical examination, quantitative sensory testing ("QST") and skin biopsy testing to propose a "reliable definition of SFN using a multimodal diagnostic approach." *Id.* at 2. Devigili et al. used the following criteria to diagnose patients with SFN:

---

[14] N. Yuki et al., *Acute Painful Autoimmune Neuropathy: A Variant of Guillain-Barré Syndrome*, 57 MUSCLE & NERVE 320 (2018).
[15] D.N. Herrmann et al., *Plantar Nerve AP and Skin Biopsy in Sensory Neuropathies with Normal Routine Conduction Studies*, 63 NEUROLOGY 879 (2004).
[16] Grazia Devigili et al., *The Diagnostic Criteria for Small Fibre Neuropathy: From Symptoms to Neuropathology*, 131 BRAIN 1912 (2008).

> At least two of the following examinations were abnormal: (i) clinical signs of small fiber impairment (pinprick and thermal sensory loss and/or allodynia and/or hyperalgesia), which distribution was consistent with peripheral neuropathy (length or non-length dependent neuropathy); (ii) abnormal warm and/or cooling threshold at the foot assessed by QST; (iii) reduced [epidermal nerve fiber density ("ENFD")] at the distal leg.

*Id.* at 4.

Devigili et al. observed that only 7.5% of their patients showed abnormal results in all three examinations. Pet'r's Ex. 39 at 9. Skin biopsy showed a diagnostic efficiency of 88.4% and clinical examination was 54.6%. *Id.* Further, Devigili et al. noted that 47.8% of patients had clinical signs of autonomic dysfunction, such as hypo-anhidrosis, flushing, or vasomotor dysfunction. *Id.* The authors stated that "[a]utonomic dysfunction is a common finding in patients with SFN, but it is likely underestimated in clinical practice. . . . SFN is associated with clinical signs of dysautonomia, which were most commonly limited to sweating and peripheral vascular impairment." *Id.* at 12.

With respect to Petitioner's diagnosis and clinical presentation, Dr. Latov opined that her symptoms and skin biopsy results were "most consistent with the diagnosis of acute onset [SFN]." Pet'r's Ex. 32 at 4; Pet'r's Ex. 77 at 2; 137–38. He added that her SFN "represents a [self-limited] variant of GBS" that was confirmed by skin biopsy. Tr. 25: 4–5.

Dr. Latov stated that Petitioner's SFN symptoms included "painful sensations throughout her body, stinging, crawling, burning, etc." Tr. 8: 19–22. Dr. Latov observed that Petitioner reported "shock pings all over," along with nerve pain, a "worming feeling," and pain in her fingers, wrists, arms, thighs, toes, feet, face, and top of head, to Dr. Berdia on March 9, 2015. Pet'r's Ex. 77 at 1 (citing Pet'r's Ex. 6 at 46–52). Additionally, Dr. Latov stated that Petitioner's evaluation with neurologist, Dr. Chin, on August 10, 2017, also documented sensory symptoms, such as allodynia, paresthesia, dysesthesias, "icepick-like pains," and crawling sensations to her face and extremities, that would be consistent with small fiber neuropathy. *Id.* at 2 (citing Pet'r's Ex. 13 at 1–5). Other symptoms that Dr. Latov associated with SFN were photophobia, which he stated, "results from abnormal functioning of the autonomically innervated pupillary muscles." *Id.*

Dr. Latov distinguished between the symptoms Petitioner reported shortly after receiving the Trumenba vaccine from SFN. Pet'r's Ex. 97 at 1; Tr. 96: 15–17; Tr. 97: 11–13. He stated that Petitioner's initial severe headache, pain in the back of the neck, and muscle stiffness and tightness were more likely "due to aseptic meningitis," and the rash that appeared four days post vaccination was "probably due to an allergic reaction." Pet'r's Ex. 97 at 1. During the hearing, he testified that other symptoms reported, such as post-exertional fatigue, ringing in ears, and muscle stiffness, were symptoms also related to an allergic reaction to the vaccine and not related to SFN. Tr. 96–97.

In his third report, Dr. Latov stated that the onset of Petitioner's SFN began on February 18, 2015, ten days post vaccination. Pet'r's Ex. 97 at 1. The Nataloni Pediatrics record from that

date noted Petitioner was experiencing "diffuse stinging and hot/cold sensations." *Id.* (citing Pet'r's Ex. 23 at 30B); *see also* Tr. 8: 11–15 ("She developed keen onset neuropathy about ten days after having received the Trumenba vaccine."). However, on cross examination, Dr. Latov acknowledged that Petitioner's mother called the pediatrician's office reporting the sensations of cold. Tr. 97: 6. Dr. Latov was also asked about a February 17, 2015 appointment record from a visit with Dr. Levine. Tr. 96–97. He noted that Petitioner was experiencing "low grade fevers and chills" and opined that the "cold" sensation was "probably part of the chills," nonspecific to SFN. Tr. 97: 9–13. When he was asked to clarify the earliest symptom Petitioner experienced related to SFN, he identified the "stinging" sensation reported by Petitioner's mother on February 17, 2015. Tr. 107: 22–25; Tr. 108: 3–5.

Dr. Latov also was questioned about Petitioner's reported symptoms from 2021, and whether daily weakness, fatigue, insomnia, or muscle pain are related to SFN. Tr. 79: 18–20. Dr. Latov testified that "if [the symptoms] began at the time she developed [SFN] and continued, they probably are a consequence of that." Tr. 79: 23–25. He stated that pruritus, muscle aches, and fatigue could be symptoms of neuropathy. Tr. 78: 9, 25. Dr. Latov referred to the Oaklander et al.[17] article, which described symptoms associated with SFN, including fatigue. Tr. 169: 4–10 (referring to Pet'r's Ex. 54). Oaklander et al. explained that SFN can co-exist with large fiber predominant neuropathy and "[s]ensory small fibers' outward signaling capacities blur classic somatosensory, motor, and autonomic distinctions." Pet'r's Ex. 54 at 2. Traditional descriptions of SFN include "spontaneous and stimulus-evoked distal skin pain and sensory loss," and "deep aching, fatigue, post-exertional malaise, and neuropathic itch are also common." *Id.* Further, "[POTS], gastrointestinal complaints, and sweating complaints reflect damage to post-ganglionic unmyelinated autonomic small fibers." *Id.* During the hearing, Dr. Latov observed that Oaklander et al. described "[c]hronic bilateral neuropathic pain, fatigue, and nausea are cardinal symptoms," of small fiber neuropathy." Tr. 168: 20–25; Tr. 169: 4–10. Oaklander et al. stated that approximately one quarter of SFN patients do not present with classic stocking-and-glove presentations but can have patchy or proximal distributions of symptoms that "suggest targeting of sensory or autonomic cell bodies (ganglionitis or neuronitis) rather than axonopathy." Pet'r's Ex. 54 at 3. Dr. Latov was directed to Petitioner's records from April 30, 2021, and September 20, 2021, which recorded Petitioner experiencing "burning on skin," and "burning sensation in arms and legs," and he testified that burning sensations are "classical symptoms of neuropathy." Tr. 172: 25; Tr. 173: 1.

Dr. Latov also asserted that Petitioner's skin biopsy was consistent with SFN. Pet'r's Ex. 32 at 4; Pet'r's Ex. 77 at 3; Tr. 26: 8–17. He testified that her skin biopsy was consistent with a likely "ganglionopathy" SFN, where some areas and fibers "would be more affected than others depending on where the inflammation or damage," was located. Tr. 26: 9–12. Dr. Latov stated that Petitioner's skin biopsy "shows anatomical loss of small fibers around the sweat glands," and the epidermal nerve fibers "showed that it was normal but in the low-normal range." Tr. 26: 12–16. Dr. Latov explained that skin biopsies can confirm a diagnosis of SFN by showing a decrease in ENFD and/or decrease in sweat gland nerve fiber density ("SGNFD"), but both are not needed to confirm the diagnosis. Pet'r's Ex. 77 at 3; Tr. 27: 3–7.

---

[17] Ann Louise Oaklander et al., *Scientific Advances in and Clinical Approaches to Small-Fiber Polyneuropathy*, 76 JAMA NEUROLOGY 1240 (2019).

Dr. Latov ultimately concluded that Petitioner experienced an immediate "allergic reaction" to the meningitis vaccine she received on February 8, 2015, which developed into SFN. *See* Pet'r's Ex. 32 at 6; Tr. 8: 19–25; Tr. 9: 1–2.

### ii. Vaccine Causation

To explain how the meningococcal vaccine could cause SFN, Dr. Latov opined that the meningitis vaccine could cause SFN through the mechanism of molecular mimicry or bystander activation. Pet'r's Ex. 32 at 4–5; Pet'r's Ex. 77 at 4–6; Tr. 38: 21–22; Tr. 42: 1–4. Dr. Latov testified that these two mechanisms can work together or separately. Tr. 42: 16–18.

Dr. Latov asserted that SFN is a variant of GBS, and like GBS, SFN could be "caused by the same mechanisms as large fiber neuropathies, including autoimmune, infectious, metabolic, nutritional, toxic, or genetic diseases." Pet'r's Ex. 32 at 4. He stated that it is "generally accepted" that GBS can be caused by vaccination. Tr. 31: 14–18. Dr. Latov cited several articles, including Ghasemi & Rajabally,[18] Kafaie et al.[19], and Souayah et al.,[20] that describe the onset of SFN after vaccination. Tr. 32: 16–20 (citing Pet'r's Ex. 42); Tr. 33: 2–6 (citing Pet'r's Ex. 47); Tr. 34: 13–25 (citing Pet'r's Ex. 62).

Ghasemi & Rajabally explained that "the precise pathophysiologic mechanisms underlying SFN are often unknown and depend on the underlying etiology." Pet'r's Ex. 42 at 1. While acknowledging that "up to one third of cases are considered idiopathic," the authors explored the association between SFN and other disorders in order to "better understand[] the pathophysiologic mechanisms underlying SFN." *Id.* The article stated that SFN may coexist with other demyelinating polyneuropathies, such as GBS or CIDP, but has also been reported as occurring in patients with POTS following the HPV vaccination. *Id.* at 6. The authors noted "a report [that] describes five cases of SFN confirmed by skin biopsy following vaccination for rabies, varicella zoster, or Lyme disease. [They hypothesize that t]hese case reports suggested that acute or subacute SFN may occasionally follow immunization by other common vaccines." *Id.*

Kafaie et al. detailed the case of a female adolescent developing SFN after receiving the HPV vaccine and summarized other patients who developed SFN following hepatitis b, Lyme, and varicella zoster vaccinations. Pet'r's Ex. 47 at 1–2. The authors noted a "patient who reported generalized dysesthesia that began 10–12 days after influenza vaccination." *Id.* at 1. This case was the subject of a petition filed in the Program in 2007. *See id.* A biopsy revealed "sensory neuropathies of large and small fiver modalities," but the article cautioned that the "report primarily focused on a temporal relationship between time of vaccination and onset of symptoms." *Id.* at 2. After noting that "immune-mediated hypersensitivity to the solvents/adjuvants [ASIA], and invasion of nervous system through prolonged infection with less virulent viruses" have been suggested as pathological mechanisms, the authors noted the lack of supporting data and the

---

[18] Majid Ghasemi & Yusuf A. Rajabally, *Small Fiber Neuropathy in Unexpected Clinical Settings: A Review*, 62 MUSCLE & NERVE, 167 (2020).
[19] Jafar Kafaie et al., *Small Fiber Neuropathy Following Vaccination*, 18 J. CLINICAL NEUROMUSCULAR DISEASE 37 (2016).
[20] Nizar Souayah et al., *Small Fiber Neuropathy Following Vaccination for Rabies, Varicella or Lyme Disease*, 27 VACCINE 7322 (2009).

possibility of potential SFN mimics. *Id.* at 4. Ultimately, "further studies are required before making any conclusion about the association of various vaccination and SFN," and "[intra ENFD] is likely required before determination" in any specific case." *Id.*

The Souayah et al. article also identified five cases of SFN following administration of the rabies, varicella and Lyme vaccines. Pet'r's Ex. 62 at 1–3. Souayah et al. assumed a causal association between the vaccines and onset of SFN "based on the temporal relationship" and the exclusion of more common causes of SFN, such as diabetes. *Id.* at 2. Souayah et al. acknowledged that "[t]he pathogenesis of post-vaccination neuropathy is unclear," but suggested that molecular mimicry "is one potential mechanism." *Id.* at 3. While Dr. Latov presented these articles as evidence that SFN, like GBS, can occur after vaccination, during cross examination he acknowledged that the articles did not discuss SFN after a meningococcal vaccine. *See* Tr. 155: 16 (citing Pet'r's Ex. 47 at 3); Tr. 156: 15–24.

In his written report, Dr. Latov postulated that the mechanism for how vaccines cause SFN is molecular mimicry. Pet'r's Ex. 32 at 4. He stated that "[m]olecular mimicry occurs when there is a structural homology, due to sequence conformation, between an exogenous agent, such as a vaccine or infection, and a self or auto-antigen that is subsequently targeted." *Id.* "Induction of immune reactivity against the foreign agent results in cross-reactivity with the self-antigen, with subsequent tissue damage and autoimmune disease." *Id.* Dr. Latov explained that examples of molecular mimicry between infection and vaccination have been identified, including between the *c.jejuni* infection and GBS, and the occurrence of GBS following the original Semple anti-rabies vaccine. Pet'r's Ex. 77 at 4; Tr. 43: 3–13. He asserted that the Souayah et al. and Oaklander et al. articles provide general support for molecular mimicry as a causative mechanism for SFN post vaccination. *See* Pet'r's Ex. 62 at 3 ("Molecular mimicry is one potential mechanism."); Pet'r's Ex. 54 at 6 ("Reports of early-onset SFN after infectious exposures, particularly to human papillomavirus vaccination, suggest potential molecular mimicry.").

In the current case involving a meningococcal vaccine, Dr. Latov testified that there is an enhanced immune response due to the aluminum phosphate adjuvant and a protein component of the vaccine that "can have potential cross-reactive specificities." Tr. 38. Citing the Iglesias et al.[21] article, he explained that the adjuvanted immune stimulus "on occasion can overwhelm, you know, self-protective regulatory mechanism and induce autoimmunity." Tr. 38 (citing Pet'r's Ex. 45). Dr. Latov further asserted that the vaccine contains a lipid component which stimulates TLR receptors that "could induce production of autoantibodies." *Id.* This process, if it "induces [a] cross reactive response, [] could augment that." Tr. 39: 4–5.

Dr. Latov testified that the Luo et al.[22] article demonstrates that the lipoprotein in the Trumenba vaccine acts like an adjuvant, which "activates the immune system to overcome tolerance and induce antibody production." Tr. 58: 15–17 (citing Pet'r's Ex. 49). He stated that "[t]he lipid portion [of the vaccine] can activate innate receptors, specifically TLR-2 receptors- to boost the immune system on immune cells." Tr. 57: 13–17. Dr. Latov explained that Luo et al.

---

[21] E. Iglesias et al. *Influence of Aluminum-Based Adjuvant on the Immune Response to Multiantigenic Formulation*, 19 VIRAL IMMUNOLOGY 712 (2006).
[22] Yin Luo et al., *The Dual Role of Lipids of the Lipoproteins in Trumenba, a Self-Adjuvating Vaccine Against Meningococcal Meningitis B Disease*, 18 AAPS J. 1562 (2016).

demonstrated that if the lipid portion of the vaccine was removed, the vaccine would not be able to activate innate receptors. Tr. 57: 18–22. In his opinion, Luo et al. demonstrates that "the vaccine activates the immune system both with specific and antigen nonspecific mechanisms." Tr. 57: 20–22. He argued that Trumenba is considered a "self-adjuvanting vaccine." Pet'r's Ex. 49 at 8–9. Luo et al. explained that the protein polypeptides give rise to functional bactericidal antibodies, and the N-terminal lipids serving as an adjuvant, can activate the innate immune system *via* the recognition by TLR-2 and promoting its crosstalk with the adaptive immune system to produce antibodies against the polypeptide epitopes." *See id.* ("Since antibodies to the lipid moieties are not generated *in vivo*, the immune-enhancing effect of the lipids is believed to be similar to that of a conventional adjuvant, and thus, bacterial lipoprotein/lipopeptide containing vaccines are recognized as one category of self-adjuvanting vaccines.").

Dr. Latov then explained that the antibodies generated by the Trumenba vaccine could target the contactin-associated protein-1 ("Caspr-1"), a human antigen found at the nodal structure of the nerves, which are autoantibody targets found in other neuropathic diseases, such as GBS and CIDP. Pet'r's Ex. 97 at 2. He referenced the Doppler et al.[23] and Appeltshauser et al.[24] articles to support his theory that the immune response to the Trumenba vaccine can result in autoantibodies that bind to human proteins such as Caspr-1, found at the nodal structures of the nerves, causing damage and resulting in neuropathy. *Id.* at 2 (citing Pet'r's Exs. 98, 104); Tr. 48: 1–24.

The Doppler et al. study identified one GBS and one CIDP patient with anti-paranodal autoantibodies to Caspr. Pet'r's Ex. 104 at 8. The authors found "[s]evere disruption of the paranodal and nodal architecture" in the teased fibers of the sural nerve biopsy and in the dermal myelinated fibers "supporting the notion of the paranodes being the site of pathology." Pet'r's Ex. 104 at 1. Dr. Latov testified that Doppler et al. demonstrates that antibodies can bind to the cells that express Caspr-1 "along the peripheral nerves and at the nodes," and the antibodies activity is causing the damage to the nerves. Tr. 50: 14–24; Tr. 51: 12–15. The authors noted, "[n]europathic pain has not been described in patients with autoantibodies against other paranodal proteins so far, but some patients with chronic idiopathic pain have autoantibodies against the juxtaparanodal protein Caspr-2." Pet'r's Ex. 104 at 10. Further, the article stated that neuropathic pain in one of their patients resolved quickly after rituximab and that "the quick relief of pain after treatment as well as normal intraepidermal nerve fiber density . . . argues against small nerve fiber or neuronal damage in these patients but rather for a functional effect by antibody binding to nociceptive neurons." *Id.* Doppler et al. found that motor symptoms were more severe than sensory symptoms in their patients, and there was a stronger binding to paranodes of motor fibers compared to sensory fibers, but they did observe a "weak binding to sensory fibers" and "severe destruction of paranodal architecture in the sural nerve," did reflect some sensory involvement, albeit less dominant. *Id.*

Dr. Latov referred to the Appeltshauser et al. article to support his assertion that the antibodies generated by the meningococcal vaccine target paranodal antigens in the peripheral nervous system, such as Caspr-1, which then cause destruction of the small-diameter somatic and

[23] Kathrin Doppler et al., *Auto-Antibodies to Contactin-Associated Protein 1 (Caspr) in Two Patients with Painful Inflammatory Neuropathy*, 139 BRAIN 2617 (2016).
[24] L. Appeltshauser et al., *Antiparanodal Antibodies and IgG Subclasses in Acute Autoimmune Neuropathy*, 7 NEUROLOGY: NEUROIMMUNOLOGY & NEUROINFLAMMATION, 5 (2020).

autonomic unmyelinated C-fibers and/or thinly myelinated A-delta fibers. Pet'r's Ex. 97 at 3; Pet'r's Ex. 98; Tr. 48: 1–24. Appeltshauser et al. set out "[t]o determine whether IgG subclasses of paranodal autoantibodies are related to disease course." Pet'r's Ex. 98 at 1. Published four years after Doppler et al., Appeltshauser et al. examined subclasses of antiparanodal autoantibodies in GBS and CIDP patients to determine if the autoantibodies were related to disease course. *Id.* Antiparanodal autoantibodies were detected in 4.3% of CIDP and GBS patients' serum they examined, with a higher frequency in CIDP patients. *Id.* at 8. Autoantibodies to Caspr-1 and contactin-1 were identified in both GBS and CIDP patients and higher antibody titers during the acute phase of the disease suggested the autoantibodies were pathogenetic. *Id.* The study revealed IgG4 antibodies in acute-onset neuropathies manifesting as monophasic GBS and "that in some patients, an IgG subclass switch from TgG3 to IgG4 may be the correlate of a secondary progressive or relapsing course following a GBS-like onset." *Id.* The authors were able to "show that the antibody status was concordant with disease severity. Therefore, [] data support pathogenicity of autoantibodies and suggest [their] status and titer are valid indicators for disease activity." *Id.*

Relying on the Kanduc[25] article, Dr. Latov identified homology between components of the Trumenba vaccine and human antigens. Pet'r's Ex. 97 at 3 (citing Pet'r's Ex. 112). Kanduc stated that the Trumenba vaccine includes the lipoprotein fHbp, which "elicits a robust bactericidal antibody response that correlates with the amount of fHbp expressed on the bacterial surface." Pet's'r Ex. 112 at 1; *See* Tr. 58: 1–3. Kanduc identified amino acid sequences from fHbp (described as pentapeptides) and occurrences within the human proteins, finding "fHbp pentapeptides repeatedly occur for a total of 2,809 multiple occurrences in human protein alterations which can lead to severe disease." Pet'r's Ex. 112 at 1–2. Specifically, Kanduc identified the peptide sequences of HAVIS and VDGQL as overlapping between fHbp and human protein Caspr-1 and associated diseases include "hypomyelinating neuropathy." *Id.* at 2.

Applying his theory that antiparanodal autoantibodies identified in GBS and CIDP patients can also be pathogenetic in SFN, Dr. Latov referred to the Gendre et al.[26] study, which examined clinical features and pathogenesis of acute onset SFN. Tr. 53: 3–9 (citing Pet's'r Ex. 108). Gendre et al. identified one SFN patient with autoantibodies to Caspr-2 but also explained that SFN patients' sera "contained antibodies to unmyelinated or thinly myelinated fibers, including the paranodal regions," but that they could not exclude the possibility "that these immunoreactions were a consequence of peripheral nervous system lesions and not the cause of the lesions." Pet'r's Ex. 108 at 10. Dr. Latov testified that the finding of autoantibodies to Caspr-2 was "not directly relevant here," however, the article does show that antibodies are "binding to the structures in [the] nerve which could cause neuropathy." Tr. 53: 3–9.

Dr. Latov testified that the Kanduc, Appeltshauser, Doppler, and Gendre articles support his opinion that SFN is an autoimmune disease like GBS, as it can follow infection or vaccination, and that antibodies to neural structures at the site of damage could be the cause of the disease through molecular mimicry. Tr. 55: 13–19.

---

[25] Darja Kanduc, *Molecular Mimicry between Meningococcal B Factor H-Binding Protein and Human Proteins*, 10 GLOB. MED. GENETICS 311 (2023).
[26] Thierry Gendre et al., *Characterizing Acute-Onset Small Fiber Neuropathy*, 11 NEUROLOGY: NEUROIMMUNOLOGY & NEUROINFLAMMATION 2 (2024).

Dr. Latov also proposed bystander activation as a mechanism for which the Trumenba vaccine can cause SFN. Pet'r's Ex. 32 at 5; Pet'r's Ex. 97 at 2. He described bystander activation as occurring when "infection or immunization can stimulate the immune system to overcome immune tolerance, allowing activation of autoreactive cells, resulting in autoimmune disease." Pet'r's Ex. 32 at 5. He referenced the Nogai et al.[27] and Soulas et al.[28] articles to demonstrate that bystander activation has been accepted as the mechanism for inducing autoimmune conditions. *Id.* at 5 (citing Pet'r's Exs. 52, 63). Nogai et al. used lipopolysaccharides injections to activate the innate immune system and was able to demonstrate that autoreactive T-cells can be activated independent of T-cell receptor ("TCR") antigen recognition. Pet'r's Ex. 52 at 4. The authors stated that "memory/effector T-cells were more susceptible to [T-cell-receptor] independent bystander activation than naïve [T-helper] cells." *Id.* Further, they opined that "bystander activation of autoreactive Th cells occurs independently of T-cell receptor antigen recognition and fits the clinical and epidemiological data on the connection between infection and autoimmunity," because, "[a] variety of infections increase the risk of exacerbations in MS patients, but despite extensive efforts, no specific pathogen has been identified as culprit." *Id.* at 7. The Soulas et al. article explored how bacterial infections, specifically *B.burgdorferi*, can activate autoreactive B cells to rheumatoid factor, absent specific antigen stimulation, resulting in hypergammaglobulinemia. Pet'r's Ex. 63 at 8.

Dr. Latov also referred to Sharkey et al.[29], Luo et al., and Iglesias et al., to explain how the Trumenba vaccine could cause SFN through bystander activation. Tr. 56: 11–20; Tr. 57: 9–22; Tr. 59: 11–21; *see also* Pet'r's Ex. 32 at 5; Pet'r's Ex. 97 at 2. Sharkey et al., according to Dr. Latov, demonstrates that the vaccine can cause the development of immune cells that affects the ability of the factor H protein from downregulating complement activity that helps prevent damage to host tissue. Pet'r's Ex. 32 at 8; Tr. 56: 11–25. He testified that the antibodies to fHbp can "prevent" the factor H protein from "downshifting the immune system," leading to a "slight increase in immune reactivity." Tr. 56–57. Sharkey et al. wrote that "the interaction between host FH and fHbp vaccine antigen also could elicit serum anti-FH autoantibodies," and a mice model experiment showed support for this hypothesis when mice immunized with MenB-4C development anti-FH antibodies. Pet'r's Ex. 59 at 2. Sharkey et al. found a "small but statistically significant increase in serum antibody reactivity to FH at three weeks" post vaccination. *Id.* at 7. Despite this finding, the authors concluded, "these small average increases in anti-FH after vaccination are therefore unlikely to pose an increased risk of anti-FH autoimmune disease." *Id.* at 7–8.

Dr. Latov opined that the onset of Petitioner's SFN symptoms, between February 18, 2015 and March 9, 2015, was medically appropriate based on the mechanisms of molecular mimicry or bystander activation. Pet'r's Ex. 32 at 5–6. During the hearing, Dr. Latov reviewed the Schonberger

---

[27] Axel Nogai et al., *Lipopolysaccharide Injection Induces Relapses of Experimental Autoimmune Encephalomyelitis in Nontransgenic Mice via Bystander Activation of Autoreactive CD4+ Cells*, 175 J. IMMUNOLOGY 959 (2005).

[28] Pauline Soulas et al., *Autoantigen, Innate Immunity, and T cells Cooperate to Break B Cell Tolerance during Bacterial Infection*, 115 J. CLINICAL INVESTIGATION 2257 (2005).

[29] Kelsey Sharkey et al., *Anti-Factor H Antibody Reactivity in Young Adults Vaccinated with a Meningococcal Serogroup B Vaccine Containing Factor H Binding Protein*, 4 MSPHERE 4 (2019).

et al. [30] article, which examined the incidences of GBS after the 1976 flu vaccine, and he observed that incidences of GBS peaked two weeks after vaccination. Tr. 64: 21–25 (citing Pet'r's Ex. 124). He noted that about one month prior to receiving the Trumenba vaccine, Petitioner had been diagnosed with an upper respiratory infection, which would put onset of symptoms approximately 40 days after the infection. Tr. 63: 21–25 (*see also* Pet'r's Ex. 2 at 14). Based on the information from the Schonberger et al. article, Dr. Latov testified that "it's more likely that the GBS was induced by the vaccination rather than by the infection, which occurred more than 40 days prior to the onset of her symptoms." Tr. 65: 1–4.

He concluded that Petitioner did not have symptoms of neuropathy prior to the vaccination and that it was more likely that the Trumenba vaccine caused an autoimmune reaction, resulting in SFN symptoms ten days later. Tr. 69: 6–14, 19–22.

**b. Dr. Bromberg**

Dr. Bromberg submitted one expert report and testified at the entitlement hearing. Resp't's Ex. B; Tr. 3. Dr. Bromberg acknowledged that "a clinical event took place temporally linked to [Petitioner] receiving the meningococcal B vaccine," but stated that her signs and symptoms could not support a diagnosis of SFN. Resp't Ex. B at 7; *see also* Tr. 290: 11–12.

In his report, Dr. Bromberg stated that Petitioner's initial headache and neck stiffness were "more consistent with aseptic meningitis." Resp't's Ex. B at 6. During the hearing, Dr. Bromberg testified that Petitioner's symptoms reported were consistent with aseptic meningitis symptoms described in the Velehe-Okoumo et al.[31] article. Tr. 297: 2–24 (citing Pet'r's Ex. 94). Dr. Bromberg also agreed with Dr. Latov that the initial symptoms Petitioner reported, neck and shoulder pain, chills, fever, and rash, were unrelated to SFN. Tr. 218: 2–6. He considered Dr. Latov's opinion that Petitioner could have also experienced an "allergic reaction" to the Trumbena vaccine. Tr. 223: 17–24.

Dr. Bromberg wrote that the diagnostic criteria for SFN is evolving. Resp't Ex. B at 5. He noted that seven diagnostic guidelines have been proposed across 84 clinical studies. *Id.* With respect to Petitioner's signs and symptoms as they relate to SFN, he stated that her "symptoms of pain are not well localized," across her medical evaluations by neurologists or as reported in her VAERS report. *Id.* at 5. He also observed that Petitioner had no sweating abnormalities that could be linked to her reduced sweat gland nerve fiber density finding. *Id.* Lastly, he stated that Petitioner did not have signs referable to small fiber symptoms, such as reduced perception to pinprick. *Id.*

During the hearing, most of Dr. Bromberg's testimony was spent reviewing Petitioner's medical records. He reviewed Petitioner's medical records from Dr. Levine throughout his testimony and was critical about the information the records provided, including limited physical examination notations, and conclusory assessments. Tr. 230: 11–17; Tr. 247: 2–9 (citing Pet'r's

---

[30] Lawrence B. Schonberger et al., *Guillain-Barré Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976-1977*, 110 AM. J. OF EPIDEMIOLOGY 105-123 (1979).

[31] Melissa Yelehe-Okouma et al., *Drug Induced Aseptic Meningitis: A Mini Review*, 32 FUNDAMENTAL & CLINICAL PHARMACOLOGY 252 (2018).

Ex. 7 at 18). More specifically, in the early appointments with Dr. Levine, Dr. Bromberg observed that Petitioner's physical examinations were normal, including sensory and strength examinations; however, Dr. Levine did not wait until test results were returned to write a letter on behalf of Petitioner, asking for accommodations due to "an Autoimmune disorder," that rendered Petitioner "disabled." Tr. 234: 3–15; *see also* Pet'r's Ex. 6 at 61. Dr. Bromberg stated that he would not have assessed a patient with an autoimmune condition based on the constellation of symptoms Petitioner reported and her physical examination. Tr. 234: 23–25. Instead, he opined that Dr. Levine's February 20, 2015 letter requesting accommodations for Petitioner appeared to be based on a "pre-evaluation impression," in some way based on the mother's symptomatology, and what Dr. Levine specializes in." Tr. 234: 16–19. Dr. Bromberg also later testified that he did not find other medical records from Dr. Levine particularly persuasive, as the physical examinations that noted "diminished sensory and vibratory over both upper and lower extremities," were non-specific to location. Tr. 247: 3–9.

Dr. Bromberg reviewed Petitioner's first neurology appointment from March 9, 2015 with Dr. Berdia, and stated that at this appointment Petitioner had some symptomology that could be related to neuropathy, such as "nerve pain," and "worming feeling," but that other symptoms, such as dizziness and fatigue are general terms that he could not consider "in a meaningful way." Tr. 239: 7–24. He noted that the physical examination was normal and that it was not clear if a sensory examination had been performed; therefore, he stated that he would be unable to make a diagnosis of autoimmune neuropathy based on the examination findings. Tr. 245: 15–19.

Dr. Bromberg discussed Petitioner's May 7, 2015 appointment with neurologist, Dr. Weimer, and testified that the record had more detail regarding the physical examination of Petitioner, making Dr. Weimer's diagnosis of "numbness" appear to be reasonable. Tr. 260: 14–21; Tr. 262: 1–3. Dr. Bromberg observed that Petitioner's sensory examination was normal. Tr. 260: 22–24 (citing Pet'r's Ex. 9 at 10). Dr. Bromberg agreed with Dr. Weimer's assessment that Petitioner's was not experiencing a "progressive disorder." Tr. 266: 1–4.

Dr. Bromberg testified none of Petitioner's treating providers diagnosed her definitively with SFN; it was only Petitioner *reporting* that she had been diagnosed with SFN. Tr. 274: 21–25; Tr. 275: 1–9. He also testified that when Petitioner presented to Dr. Chin on August 9, 2017, it was represented that Dr. Weimer "diagnosed prior aseptic meningitis and *current* [SFN]," but that was inconsistent with the actual assessment by Dr. Weimer. Tr. 281: 17–24 (emphasis added) (*see* Pet'r's Ex. 9 at 13 ("She may have had a mild case of aseptic meningitis and limited immune reaction but I am very doubtful that she has an active ongoing process. She shows no signs of significant or detectable neurological deficits or neuropathy, although a restricted [SFN] remains possible.")).

With respect to Petitioner's August 7, 2015 skin biopsy, Dr. Bromberg testified that it did not definitely establish that Petitioner had SFN. Tr. 290: 11–12. The sample taken from Petitioner's right calf showed normal intraepidermal nerve fiber density, even though it fell within the "low-to-normal range." Tr. 287: 20–24. Dr. Bromberg acknowledged that the sweat gland nerve fiber density sample from Petitioner's right calf was reduced but stated that assessing sweat gland tissue can have technical issues. Tr. 288: 17–25; Tr. 289: 1–4. Dr. Bromberg testified that "sweat glands tend to be deeper in the skin than are the readings for the intraepidermal fiber density," making it

difficult to get a sample with adequate tissue, and then due to the size of the sweat glands, having an appropriate microscope to assess the tissue can create a challenge. Tr. 288: 23–25; Tr. 289: 1–4. Dr. Bromberg testified that at his laboratory, they did not offer sweat gland assessment because of the technical challenges he described. Tr. 289: 16–24. Dr. Bromberg did not consider the reduced sweat gland nerve fiber density a "priority" because it is "not the most relied upon assessment to make a diagnosis of loss of small fibers." Tr. 290: 2–5. When he was asked if SFN can be made based on clinical signs and just abnormal sweat gland nerve fiber density or epidermal nerve fiber density, as defined in the Novak[32] paper, Dr. Bromberg testified that he would be "less comfortable" with an abnormal sweat gland assessment. Tr. 303: 7–25 (citing to Pet'r's Ex. 91); Tr. 304: 1–3.

He ultimately opined that Petitioner's signs and symptoms were not consistent with a diagnosis of SFN or a form of GBS. Resp't Ex. B at 7.

**c. Dr. Tompkins**

Dr. Tompkins submitted an expert report and testified during the entitlement hearing. *See* Resp't's Ex. A; Tr. 3. He deferred to Dr. Bromberg's opinion that Petitioner did not have SFN or a variant of GBS. Resp't's Ex. A at 4.

Dr. Tompkins accepted the theory of molecular mimicry as a mechanism for inducing some autoimmune conditions after infection in limited circumstances, such as GBS occurring after a *c.jejuni* infection. Resp't's Ex. A at 7–8; Tr. 342–43. He testified that to "prove" that molecular mimicry is a valid mechanism for an infection causing an autoimmune condition, he would look towards epidemiological studies to determine if the infection is associated with the subsequent autoimmune disease. Tr. 338: 1–21. When asked on cross examination if he believed that vaccines could cause GBS, Dr. Tompkins acknowledged that some epidemiological evidence existed associating the 1976 swine flu vaccine with GBS, but there was not sufficient information on the mechanism. Tr. 380: 21–25. Dr. Tompkins did not believe that there was sufficient evidence to demonstrate that any vaccine can cause SFN, and that there was no data that demonstrated a meningococcal infection could cause SFN through molecular mimicry. Tr. 381: 7–10, 20–23. Dr. Tompkins stated that there are no epidemiological studies that link the Trumenba vaccine to SFN. Tr. 356: 12–19.

Dr. Tompkins disagreed with Dr. Latov that the antigen structures of the Trumenba vaccine are structurally similar to *c.jejuni*, which is implicated in the development of anti-ganglioside antibodies in GBS. Resp't's Ex. A at 8; Tr. 344. He testified that the lipid structure in *c.jejuni* and antigens in Trumenba may be "close" in structure, but the lipid is not what has been implicated in *c.jejuni* causing GBS. Tr. 344: 3–12. Dr. Tompkins stated that antigens in Trumenba are highly purified after expression in *E. coli*. Resp't's Ex. A at 5. He continued that the "fatty acid chains [are] linked to the bacterial protein," which results in lipoproteins, epitopes that are different from the epitopes implicated in ganglioside molecular mimicry between *c.jejuni* and GBS. *Id.* During the hearing, Dr. Tompkins acknowledged that the Kanduc article identified amino acid sequences

[32] Peter Novak, *Electrochemical Skin Conductance Correlates with Skin Nerve Fiber Density*, 8 FRONTIERS AGING NEUROSCIENCE 199 (2016).

in the factor H binding protein ("fHbp") contained in Trumenba that were also found in human protein sequences, but he argued that identification of shared structure does not necessarily equate to antigenicity. Tr. 353: 6–13; Tr. 330: 19–23 ("[J]ust because you have a shared structure doesn't mean that, one, you, you would have an immune response to that structure, or, two that your B cells and T cells would ever even be exposed to that structure to be able to respond to it."). He testified that "if we expect every single shared epitope is a possible . . . epitope that could cause autoimmune disease, why don't we have rampant autoimmune disease?" Tr. 348: 16–19. Dr. Tompkins concluded that Kanduc does not demonstrate molecular mimicry as a mechanism for which the Trumenba vaccine could cause SFN. Tr. 355: 5–8.

With respect to Dr. Latov's theory of bystander activation, Dr. Tompkins acknowledged that some of the animal studies Dr. Latov cited to are "indicative of the existence of bystander activation," as a mechanism for inducing autoimmune disease. Tr. 367: 3–7. He testified that the Sharkey et al. paper showed that antibodies elicited by the meningococcal B vaccines can bind to complement factor H ("fH"), but that the antibodies do not actually block complement factor H function, thus not increasing complement mediated damage. Tr. 373: 14–24 (citing Pet'r's Ex. 59 at 9). Dr. Tompkins noted that Sharkey et al. only found a transient increase in antibodies that could bind to complement fH, and that the meningococcal vaccine that was tested was not the Trumenba vaccine. Tr. 375: 2–7. The vaccine from the study has another adjuvant, "[s]o there are other things that could be driving the -- you know, enabling the development of this transient immune response." Tr. 375: 11–13. He added that the authors "actually said they also don't see any, you know, negative outcomes from this, no increases in autoimmune disease or other complement-associated diseases." Tr. 375: 16–19.

Lastly, Dr. Tompkins argued that the onset of two or three days of symptoms related to SFN would be too soon based on the mechanisms Dr. Latov proposed. Tr. 386: 9–12; *see also* Resp't's Ex. A at 11. He testified that antibody responses take several days to be measurable, explaining that the innate response "may be holding an infection at bay as best it can." Tr. 386: 4–5. That allows "time for the activation, the proliferation, the differentiation, and then antibody production of, in the case of B cells, for all of that to happen." Tr. 386: 5–7. Dr. Tompkins returned to the Sharkey et al. paper, noting they looked at serum antibody responses, "after two exposures to the vaccine, so they're primed and then they're boosted, and then they're looking -- . . . 14 or 21 days after the boost, and then they see the antibody response . . . ." Tr. 386: 14–18. He acknowledged that Petitioner exhibited symptoms of an inflammatory response to the vaccine, such as fever and aches and pains, but that it still takes several days for antibodies to develop. Tr. 392: 1–4; Tr. 386: 9–11. Ultimately, Dr. Tompkins concluded that the onset of SFN symptoms less than three days post vaccination was not a reasonable time interval to elicit an antibody response, triggered either by bystander activation or molecular mimicry. Resp't's Ex. A at 11.

Dr. Tompkins concluded that neither molecular mimicry nor bystander activation were valid mechanisms for explaining how the Trumenba vaccine could cause SFN. Resp't's Ex. A at 10.

## VI. Applicable Legal Standards

To receive compensation under the Vaccine Act, a petitioner must demonstrate either that: (1) the petitioner suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as modified by 42 C.F.R. § 100.3; or (2) that the petitioner suffered an "off-Table injury," one not listed on the Table, as a result of her receiving a covered vaccine. *See* § 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006). In this case, Petitioner does not allege a Table injury, and thus Petitioner must prove by preponderant evidence that her injury was caused-in-fact by a Table vaccine.

### A. Factual Issues

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding her claim. § 13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records, "in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejection the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 538 (2001) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.") (citation omitted).

There are situations in which compelling testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell ex. rel. Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[W]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting *Murphy v. Sec'y of the Dep't of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (Fed. Cl. 1991)). Ultimately, a determination regarding a witness' credibility is needed when determining the weight that such testimony should be afforded. *Andreu ex. rel. Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Dep't of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Valenzuela v. Sec'y of Health & Hum. Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Hum. Servs.*, No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (Section 13(b)(2) "must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions,

medical judgment, test reports, etc.), but does not require the special master or court to be bound by them.").

### B. Causation-In-Fact

To establish causation-in-fact, a petitioner must demonstrate by a preponderance of the evidence that the vaccine was the cause of the injury. § 300aa-13(a)(1)(A). A petitioner is required to prove that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321–22 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999).

In the seminal case of *Althen v. Sec'y of Health & Hum. Servs.*, the Federal Circuit set forth a three-pronged test used to determine whether a petitioner has established a causal link between a vaccine and the claimed injury. *See* 418 F.3d 1274, 1278–79 (Fed. Cir. 2005). The *Althen* test requires petitioners to set forth: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. To establish entitlement to compensation under the Program, a petitioner is required to establish each of the three prongs of *Althen* by a preponderance of the evidence. *Id.* "[C]lose calls regarding causation are resolved in favor of injured claimants." *Id.* at 1280. Further, evidence used to satisfy one prong of the test may overlap to satisfy another prong. *Capizzano*, 440 F.3d at 1326.

Under the first prong of *Althen*, a petitioner must offer a scientific or medical theory that answers in the affirmative the question: "can the vaccine[] at issue cause the type of injury alleged?" *See Pafford v. Sec'y of Health & Hum. Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. denied*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such theory must only be "legally probable, not medically or scientifically certain." *Id.* at 548–49. Petitioners are not required to identify "specific biological mechanisms" to establish causation, nor are they required to present "epidemiologic studies, rechallenge[] the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities." *Capizzano*, 440 F.3d at 1325 (quoting *Althen*, 418 F.3d at 1280). Scientific and "objective confirmation" of the medical theory with additional medical documentation is unnecessary. *Althen*, 418 F.3d at 1278–81; *see also Moberly*, 592 F.3d at 1322. However, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (citing *Moberly*, 592 F.3d at 1322). Indeed, the Federal Circuit has "consistently rejected theories that the vaccine only 'likely caused' the injury and reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019) (citing *Moberly*, 592 F.3d at 1322; *LaLonde*, 746 F.3d at 1339). Rather, "[a] petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case." *Moberly*, 592 F.3d at 1322. In general, "the statutory standard of preponderance of the evidence requires a petitioner to demonstrate that the vaccine more likely than not caused the condition alleged." *LaLonde*, 746 F.3d at 1339.

Furthermore, establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of her claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). The Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* requires that courts determine the reliability of an expert opinion before it may be considered as evidence. 509 U.S. 579 (1993). However, in the Vaccine Program, the *Daubert* factors are used in the weighing of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("[U]niquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to the persuasiveness of expert testimony already admitted."); *see also Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)). Under *Daubert*, the

> factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

The *Daubert* factors are "meant to be helpful, not definitive." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The factors do not "constitute a 'definitive checklist or test'" and may be applied differently depending on the facts of a particular case. *Id.* at 150 (quoting *Daubert*, 509 U.S. at 593).

"In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590 (citation omitted). Thus, for Vaccine Act claims, a "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly*, 592 F.3d at 1324. Nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Synder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also D'Tiole v. Sec'y of Health & Hum. Servs.*, No. 15-085V, 2016 WL 7664475, at *24 (Fed. Cl. Spec. Mstr. Nov. 28, 2016) (stating that the Vaccine Act "require[s] a chain of reliable propositions supporting [a] petitioner's theory").

Under the second prong of *Althen*, a petitioner must prove that the vaccine actually did cause the alleged injury in a particular case. *See Pafford*, 2004 WL 1717359, at *4; *Althen*, 418 F.3d at 1279. The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). A petitioner does not meet this obligation by showing only a temporal association between the vaccination and the injury; instead, the petitioner "must explain *how* and *why* the

injury occurred." *Pafford*, 2004 WL 1717359, at *4 (emphasis in original). The special master in *Pafford* noted petitioners "must prove [] both that her vaccinations were a substantial factor in causing the illness . . . and that the harm would not have occurred in the absence of the vaccination." 2004 WL 1717359, at *4 (citing *Shyface*, 165 F.3d at 1352). A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (citation omitted). Nevertheless, "[r]equiring epidemiologic studies . . . or general acceptance in the scientific or medical communities . . . impermissibly raises a claimant's burden under the Vaccine Act and hinders the system created by Congress . . . ." *Capizzano*, 440 F.3d at 1325–26. "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen* 418 F.3d at 1280.

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). Indeed, when reviewing the record, a special master must consider the opinions of treating physicians. *Capizzano*, 440 F.3d at 1326. This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras*, 993 F.2d at 1528. However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby*, 997 F.3d at 1383 (finding that a special master must consider the context of a medical encounter before concluding that it constitutes evidence regarding the absence of a condition). While a special master must consider these opinions and records, they are not "binding on the special master or court." § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.*

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting with testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *LaLonde v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).

To satisfy the third *Althen* prong, a petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to finger causation-in-fact." *de Bazan v. Sec'y of health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after the administration of a vaccine for the vaccine to be the

cause." *Id.* However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination and the injury are causally linked." *Id.*; *see also Locane v. Sec'y of Health & Hum. Servs.*, 685 F.3d 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

Although a temporal association alone is insufficient to establish causation, under the third prong of *Althen*, a petitioner must show that the timing of the injury fits with the causal theory. *See Althen*, 418 F.3d at 1278. The special master cannot infer causation from temporal proximity alone. *See Thibaudeau v. Sec'y of Health & Hum. Servs.*, 24 Cl. Ct. 400, 403–04 (1991); *see also Grant*, 956 F.2d at 1148 ("[T]he inoculation is not the cause of every event that occurs within the ten[-]day period . . . [w]ithout more, this proximate temporal relationship will not support a finding of causation." (quoting *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir. 1983))).

A petitioner who satisfies all three prongs of the *Althen* test has established a prima facie showing of causation. *Hammitt ex rel. Hammitt v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 719, 726 (2011). A petitioner who demonstrates by a preponderance of the evidence that she suffered an injury caused by vaccination is entitled to compensation unless the respondent can demonstrate by a preponderance of the evidence that the injury was caused by factors unrelated to the vaccination. *See Althen*, 418 F.3d at 1278; *Knudsen*, 35 F.3d at 547. In such a case, the government must not merely prove the existence of an alternative cause, but that such an alternative actually caused the injury. *Kundsen*, 35 F.3d at 549. Consequently, when and if the petitioner establishes a prima facie case, the burden the shifts to the government to prove that an alternative cause, unrelated to the administration of the vaccine, was the "sole substantial factor" in causing the alleged injury. *See de Bazan*, 539 F.3d at 1354; *see also Hammitt*, 98 Fed. Cl. at 726 (explaining that respondent's burden is to show that the "factor unrelated" was the "sole substantial factor" in causing the injury). Additionally, a factor unrelated "may not include 'any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness or condition.'" § 300aa-13(a)(2); *see also Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349 (Fed. Cir. 2010) (stating that an idiopathic diagnosis cannot be a "factor unrelated," as it is idiopathic).

## VII. Analysis

### A. Diagnosis

In cases where the diagnosis is contested, "special masters may find whether a preponderance of evidence supports any proposed diagnosis before evaluating whether a vaccine caused that illness." *Hibbard v. Sec'y of Health & Hum. Servs.*, No. 07-446V, 2011 WL 1766033, at *6 (Fed. Cl. Spec. Mstr. Apr. 12, 2011) (citing *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1345–46 (Fed. Cir. 2010)). In this case, diagnosis is in dispute, so it is appropriate to address it first. I will begin with the initial symptoms as identified in the Fact Ruling and the medical record. When Petitioner presented to the SHC three days post vaccination with complaints of fatigue, chills, a headache, neck and shoulder pain, general body aches, nausea and dizziness, the treating NP assessed her with musculoskeletal neck strain but did not diagnose a specific condition. Pet'r's Ex. 4 at 28. Following Petitioner's initial post-vaccination visit with her PCP and testing, Dr. Levine commented that Petitioner had an "autoimmune disorder" but did not

elaborate. *Id.* at 61. On February 26, 2015, Dr. Levine was more specific: autoimmune reaction to meningococcal vaccine. Pet'r's Ex. 7 at 19. Neurologist Dr. Berdia saw Petitioner on March 9, 2015, incorporated symptoms of nerve pain and shocks into her assessment, and diagnosed Petitioner with autoimmune neuropathy, vaccine-related. Pet'r's Ex. 2 at 54. Petitioner was ultimately diagnosed by neurologist Dr. Weimer with "a mild case of aseptic meningitis and limited immune reaction." Pet'r's Ex. 9 at 7. A review of these records reveals that Petitioner's treaters were unsure of her condition, at least initially, but reiterated that it was likely vaccine-related in almost every instance. While this may be helpful for a causation analysis, they are less likely when used in contemplation of the actual diagnosis.

Petitioner's expert neurologist, Dr. Latov, opined that the symptoms Petitioner experienced immediately following vaccination, specifically the complaints of severe headache, neck pain and muscle stiffness, were due to aseptic meningitis. He continued that the rash was probably due to an allergic reaction. Dr. Bromberg agreed in his written report that Petitioner's "headache and neck stiffness [was] more consistent with aseptic meningitis." Resp't's Ex. B at 6. Petitioner's treaters and the experts who rendered a diagnostic opinion in this case largely agreed that she suffered from an immediate reaction to the vaccine, specifically aseptic meningitis. They further agreed that Petitioner's headache and neck stiffness are classic symptoms of the condition, which can occur in rare cases post vaccination. Therefore, there is preponderant evidence that Petitioner developed post-vaccination aseptic meningitis. On August 20, 2015, six months following her vaccination, Dr. Levine noted that Petitioner was still suffering from symptoms and "likely [has] aseptic meningitis." Pet'r's Ex. 7 at 16.

Petitioner's claim, however, does not allege aseptic meningitis as the injury. Petitioner, in her petition, through her expert, and again in her briefings, asserted that she "suffered from [SFN] and related sequelae." Pet'r's Post-Hearing Br. at 1. In the early stages of Petitioner's presentation, her providers only "suspected" SFN as a diagnosis; however, these differentials appear confirmed following the results of her skin biopsy. Petitioner originally presented to Dr. Weimer on May 7, 2015, following her EMG/NCS study two months prior. Due to her then ongoing symptoms of "intermittent, electric shock like pain throughout her body, . . . severe skin sensitivity, and fatigue," as well as the normal results from her EMG/NCS, Dr. Wiemer noted that "a restricted [SFN] remains possible." Pet'r's Ex. 9 at 8–9. On two more occasions following her visit with Dr. Weimer, Petitioner self-reported a diagnosis of SFN. *See* Pet'r's Ex. 12 at 11 (Petitioner reporting a "history of [SFN]" to endocrinologist Dr. Aravind); Pet'r's Ex. 7 at 8 (Petitioner reporting that she had a follow-up appointment for SFN to Dr. Levine). However, on May 27, 2017, Dr. Berdia, one of Petitioner's neurologists, formally assessed her with "likely neuropathy autoimmune, vaccine related and [SFN]." Pet'r's Ex. 6 at 86. Another neurologist, Dr. Chin, later noted that Dr. Berdia only "suspected" a diagnosis of SFN. Pet'r's Ex. 13 at 1. Dr. Chin concurred with this suspicion, and ordered Petitioner's skin biopsy testing, which revealed reduced SGNFD in her distal calf and low normal ENFD "consistent with [SFN]." Pet'r's Ex. 19 at 2–3. Dr. Chin then confirmed that "[t]hese findings can support a [SFN] diagnosis." *Id.* at 5. Following this diagnosis, two more providers noted a history of SFN in Petitioner's chart: neurologist Dr. Weaver and a physician at the Orthopedic Association of Long Island Physicians.[33] *See* Pet'r's Ex. 75 at 11;

[33] The note from the Orthopedic Association of Long Island Physicians stated that Petitioner "does report a positive prior history for peripheral neuropathy as a result of previously administered meningococcal vaccination." Pet'r's Ex. 74 at 6.

Pet'r's Ex. 74 at 6. These notes do not reflect mere suspicion of SFN; rather, they reflect the thoughtful consideration of Petitioner's treating physicians as they investigated the cause of her symptoms, ultimately arriving at a definitive conclusion of SFN. The first to do so, Dr. Berdia, formally wrote his assessment of Petitioner's SFN on May 27, 2017, nearly two years after Dr. Wiemer initially suspected that Petitioner may be suffering from the disease. Even if one were to assume that Dr. Berdia's assessment was only a "suspicion" as noted by Dr. Chin and as argued by Dr. Bromberg, Dr. Chin's assessment following Petitioner's biopsy results dispels any notion of a mere "suspicion" of Petitioner's symptoms. The testing results from Petitioner's biopsies stated the findings are "consistent with" SFN, and Dr. Chin also stated himself that these findings were supportive of a SFN diagnosis, and Petitioner's future providers, including another neurologist, carried this diagnosis forward. Petitioner's treaters provide strong evidence that she eventually developed SFN.

Dr. Latov cited to the medical records that identified SFN as a suspected differential diagnosis and relied on the results of Petitioner's October 5, 2017 skin biopsy for confirmation. Pet'r's Ex. 32 at 3 (citing Pet'r's Ex. 13 at 16). He also noted that testing revealed that Petitioner had significantly reduced sweat gland nerve fiber density consistent with SFN. *Id.* (citing Pet'r's Ex. 19 at 1).

Conversely, Dr. Bromberg argued that Petitioner does not meet the diagnostic criteria for SFN. In making this argument he pointed to Petitioner's "not well localized" symptoms of pain, a lack of sweating abnormality that would be linked to her reduced SGNFD, and the findings of Haroutounian et al.,[34] which he argued showed that these such symptoms would be inconsistent with SFN. However, that does not accurately reflect the article's findings. Here, the authors endeavored to identify a unifying diagnostic criteria for SFN by examining 84 clinical studies and seven guideline/review publications to determine the most common factors utilized by other clinicians. Resp't's Ex. B, Tab 2 at 1. The authors found that the most common criteria used across the studies were sensory symptoms (60%), absence of large fiber signs (62%), and reduced ENFD (38%). *Id.* Given these findings, the authors brought together what they viewed as the "unifying" set of criteria: (1) sensory symptoms consistent with SFN; (2) confirmatory signs of small-fiber involvement; (3) absence of signs or NCS results indicating major large fiber involvement; and (4) structural and/or function determination of cutaneous small fiber loss. *Id.* at 7. The article did not discuss the presence of sweat abnormalities as being required for a positive SGNFD result, nor did the article state that "not well localized" pain symptoms discount against a SFN diagnosis. Petitioner appears to meet the criteria set forth by the authors. She frequently reported sensory symptoms consistent with SFN, such as electric shock pains and paresthesias; she experienced autonomic symptoms consistent with a SFN diagnosis as explained in Oaklander et al.; her EMG/NCS was normal and showed no signs of clinical large fiber involvement; and her biopsy revealed reduced SGNFD in her distal calf, consistent with a length-dependent SFN. These findings meet each of the criteria established in Haroutounian et al. Further, the authors noted the possibility of autonomic symptoms and testing as being able to detect SFN, but did not include it in their criteria as they "are also not widely available, making their routine incorporation as part of a diagnostic criteria challenging and explaining in part why autonomic testing was used either as a mandatory or optional criterion in 11% of the studies." *Id.* at 6. Here, Petitioner underwent

[34] Simon Haroutounian et al., *Diagnostic Criteria for Idiopathic Small Fiber Neuropathy: A Systematic Review*, 63 MUSCLE & NERVE 170 (2021).

extensive autonomic testing, resulting in a POTS diagnosis, which Oaklander et al. explained as a possible comorbidity of SFN due to the autoantibodies produced from autoreactive B cells in its pathogenesis. *See* Pet'r's Ex. 54 at 6. The filed literature supports, rather than undermines, Petitioner's SFN diagnosis.

Finally, Dr. Bromberg argued that Petitioner's SGNFD testing is insufficient to stand as objective evidence of SFN because her ENFD was low normal and SGNFD testing can "have technical issues." Tr. 289: 8. It was for this reason that Dr. Bromberg did not offer sweat gland biopsies at his laboratory, and that he would be "less comfortable" diagnosing a patient with SFN based off an abnormal SGNFD result. Tr. 304: 2. Dr. Bromberg did not provide particulars regarding the policies and diagnostics used in his laboratory. The record does reflect that Petitioner's biopsy results were examined by Therapath, "a CLIA-certified laboratory [that] is accredited by the College of American Pathologists." Pet'r's Ex. 91 at 2. Dr. Bromberg provided no evidence to support his assertion that Petitioner's biopsy may have been faulty, and without more, I am not inclined to provide his speculation further weight. Furthermore, the literature demonstrates that SGNFD is an appropriate tool to use for the diagnosis of SFN. The Novak paper reviewed abnormal SGNFD and ENFD biopsies to compare the accuracy of electrochemical skin conductance ("ESC") as another tool for the diagnosis of SFN. Pet'r's Ex. 91 at 1. In his study he relied exclusively on ENFD and SGNFD testing performed by Therapath, and he specifically listed SGNFD as one of "[t]he morphological methods . . . for assessment of . . . sudomotor fibers." *Id.* at 2. SFN was identified in all 81 subjects, with 58 subjects presenting with abnormal ENFD, 25 presenting with abnormal SGNFD, and 63 presenting with abnormal autonomic testing. *Id.* at 4. The author also made no mention of a requirement for sweating abnormalities to be present in the case of abnormal SGNFD. Given that the literature supports the usage of SGNFD and does not state such a result must be found in conjunction with abnormal ENFD (and in fact, implies the opposite), I do not find Dr. Bromberg's unsupported arguments to be persuasive to this point.

It is notable that even though Dr. Bromberg argued that Petitioner does not have SFN, his alternate theory of her symptoms inherently relied on the presence of SFN. In his report, Dr. Bromberg opined that Petitioner's elevated vitamin B6 level may be the cause of her symptoms, as "[e]levated B6 levels ***can cause a small fiber sensory neuropathy***." Resp't's Ex. B at 7 (emphasis added). Although this argument may be more appropriate in addressing potential alternate causation, the fact Dr. Bromberg invoked such a theory while simultaneously stating that Petitioner does not have SFN is itself contradictory. For the above reasons, I thus find that Petitioner has preponderantly established that she suffered from SFN.

### B. *Althen* Prong One

Under *Althen* prong one, Petitioner must set forth a medical theory explaining how the received vaccine could have caused or sustained injury. *Andreu*, 569 F.3d at 1375; *Pafford*, 451 F.3d at 1355–56. Petitioner's theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable" medical or scientific explanation. *Boatmon*, 941 F.3d at 1359; *see also Knudsen*, 35 F.3d at 548; *Veryzer v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 214, 223 (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable"), *aff'd sub nom. Veryzer v. U.S.*, 475 F. App'x 765 (Fed. Cir. 2012). If Petitioner relies upon a medical opinion to support her

theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion. *See Broekelschen*, 618 F.3d at 1347 ("The special master's decision oftentimes is based on the credibility of the experts and the relative persuasiveness of their competing theories."); *Perriera v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing *Fehrs v. United States*, 620 F.2d 255 (Ct. Cl. 1980))). Importantly, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde*, 746 F.3d at 1339. Instead, Petitioner must show it was more likely than not that the vaccine caused the condition alleged. *Id.*

The two theories proposed by Dr. Latov as to how Petitioner's meningococcal vaccine could cause her to develop SFN are molecular mimicry and bystander activation. According to Dr. Latov, these two theories could work alone or together in the pathogenesis of SFN following meningococcal vaccination. However, for the reasons discussed below, I find Dr. Latov's theories to be insufficient to meet Petitioner's burden pursuant to *Althen* prong one.

The molecular mimicry theory is underpinned by the assumption that (acute) SFN is a form of sensory GBS. Indeed, he relied primarily on evidence of cross-reaction resulting in GBS or CIDP, not specific to SFN. Dr. Latov relied on Kanduc to assert that homology between the fHbp lipoprotein in the meningococcal vaccine and contactin-1 can lead to a cross-reaction and pathogenesis. Pet'r's Ex. 112 at 2. Kanduc identified the peptide sequences of HAVIS and VDGQL as overlapping between fHbp and Caspr-1 and associated diseases include "hypomyelinating neuropathy." *Id.* While the authors asserted that "the vast sharing of immune peptide determinants between the bacterial fHbp antigen and the human proteins warns against Trumenba utilization to prevent meningococcal diseases," it is unclear what data support their conclusion that there is a "high incidence of autoimmune pathologies in the vaccinee as a result of molecular mimicry." *Id.* The article did not establish or even explain how homology develops into pathogenesis.

Additionally, Dr. Latov cited Doppler et al. and Appelthauser et al. to articulate contactin-1's role in his theory. However, these articles discussed the role contactin-1 in the pathogenesis of CIDP and the more common iteration of GBS as diagnosed. These articles do not discuss the atypical, acute-onset SFN that some have hypothesized is a variant of GBS. Doppler et al. noted that the clinical picture of a patient with autoantibodies against neruofascin-155 and contactin-1 is characterized by "acute onset of sever motor more than sensory neuropathy, very good response to treatment with rituximab, and demyelinating features in nerve conductions studies." Pet'r's Ex. 104 at 8. Further, the authors hypothesized that "the quick relief of pain after treatment as well as normal intraepidermal nerve fib[er] density as detected in Patient [One] argues against small nerve fib[er] or neuronal damage in these patients but rather for a functional effect by antibody binding to nociceptive neurons." *Id.* at 10. Dr. Latov testified that Appelthauser et al. showed that GBS patients had CASPR 1 autoantibodies that can cross react with CASPR 1. While the authors hypothesized that these antibody titers "are related to course of disease," they suggested that their results "pave the way for further clinical and pathomechanistic studies on antiparanodal autoantibodies in acute to subacute immune-mediated neuropathy." Pet'r's Ex. 98 at 10. Focusing on therapeutics, they offered no causation theory and limited their conclusion to a possible correlation to "a secondary progressive or relapsing course following a GBS-like onset," in

seropositive patients. *Id.* at 1. This disease course is inconsistent with Petitioner's presentation, and Dr. Latov did not explain how, despite these discrepancies, the conclusions about the role of antibodies described in the literature should be applied here. Dr. Latov also cited Gendre et al. because it focused on SFN, but the authors implicated contactin-2 as potentially pathogenic to SFN, not contactin-1, the molecule that is identified by Dr. Latov as cross reactive with CASPR 1. *See* Pet'r's Ex. 108.

Dr. Latov explained how pathogenic molecular mimicry can occur after exposure to *c. jejuni*, and he applied that process to meningococcal vaccine components. He argued that the lipid structure of *c. jejuni* is similar to that of the lipoprotein in the vaccine. Respondent's expert, Dr. Tompkins, disagreed and asserted that "the two antigens present in the Trumenba vaccine are highly purified after expression in *E. coli* and do not contain the complex oligosaccharide head implicated in *c. jenuni* molecular mimicry." Resp't's Ex. A at 5. Therefore, they do not contain the epitopes implicated in GM1 molecular mimicry. *Id.* Dr. Tompkins also noted the lack of epidemiologic evidence to show a potential for molecular mimicry between the vaccine and SFN.

Dr. Latov presented preponderant evidence that an acute sensory SFN has been discussed in the medical literature and contemplated as an atypical GBS variant. He also presented preponderant evidence that pathogenic molecular mimicry can and has occurred in the context of wild infections and other vaccines. However, he has not presented preponderant evidence that the meningococcal vaccine can cause an SFN variant of GBS via molecular mimicry. When asked about post-vaccination neuropathy, he stated, "[m]olecular mimicry is one potential mechanism, nonspecific." Tr. 44: 4–5. When asked about the meningococcal vaccine and SFN specifically, he testified that there is support in the medical literature "for acute-onset [SFN] being an autoimmune disease similar to [GBS] based on, you know, studies showing that it can follow infection or vaccination, and they have -- they have demonstrated antibodies to neural structures at the site of damage which could be the cause of the disease." Tr. 55: 14–19. He did not articulate a sound and reliable explanation, even assuming there is some homology between protein sequences in the vaccine and neural cells, about how pathogenic cross-reaction occurs, causing diffuse damage to the small, sensory nerves.

As an alternative theory of causation, Dr. Latov offered bystander activation, occurring alone or in conjunction with molecular mimicry to cause autoimmunity following meningococcal vaccination. Dr. Latov again relied on medical literature to explain how the asserted biological mechanism works, but he was unable to link the studies back to the condition alleged in this case. He noted that Nogai et al. found lipopolysaccharides can cause experimental autoimmune encephalomyelitis ("EAE") in mice via bystander activation, but cautioned that it was different than cytokine bystander activation. Also of note, the article's conclusions were myelin cell specific, although the neuropathy variant asserted in this case is not dependent on demyelination.

Sharkey et al., Luo et al., and Iglesias et al. are additional articles that Dr. Latov cited to support his bystander activation theory. Sharkey et al. explained how the vaccine can cause the production of anti-factor H antibodies, which the authors noted "have been causally implicated in rare diseases of complement dysregulation such as autoimmune atypical hemolytic uremic syndrome and C3 glomerulopathies." Pet'r's Ex. 59 at 2. Notably, these are the only two autoimmune conditions discussed by the article as being activated via the antibodies, and Dr. Latov

used it to state that these antibodies can cause any autoimmune disease via bystander activation. As special masters have noted in the past, *Althen* prong one is not satisfied by merely identifying a plausible generic causation theory and arguing applicability to any vaccine and autoimmune disease.

Luo et al. discussed how vaccine lipids can make the vaccine self-adjuvanting. Iglesias et al. discussed how aluminum can also act as an immune stimulant. Dr. Latov cited these articles generally to state that they stimulate the immune system and therefore increase the risk of bystander activation. The studies, however, do not identify SFN as a condition that can be caused in this way, and Dr. Latov never explained how we get from the conditions that are named to this ayptical SFN. There is not preponderant evidence in the record of a sound and reliable medical explanation for how the meningococcal vaccine can cause SFN, via bystander activation, molecular mimicry, or both.

While Petitioner did not allege aseptic meningitis as an injury, nor did she provide a causation theory linking her vaccine to that condition, there is strong evidence supporting causation within the record. Most of Petitioner's treaters and the experts in this case opined that Petitioner suffered from an immediate reaction to the vaccine and aseptic meningitis. Respondent's expert immunologist, Dr. Tompkins, acknowledged that the meningococcal vaccine can illicit an inflammatory response including symptoms such as headache, fever, aches, and pains. Tr. 392: 1–4; Tr. 386: 9–11. These symptoms were, in part, the basis for Petitioner's meningitis diagnosis. Dr. Bromberg asserted that aseptic meningitis could not be caused by the vaccine, but he did not persuasively explain why a condition that develops, by definition, in the absence of a bacterial infection (aseptic) would then need an infectious trigger. The record includes preponderant evidence that Petitioner's meningococcal vaccination could cause her aseptic meningitis, pursuant to *Althen* prong one.

### C. *Althen* Prong Two

Under *Althen* prong two, Petitioner must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Capizzano*, 440 F.3d at 1324 (quoting *Althen*, 418 F.3d at 1278). "Petitioner must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" *Pafford*, 451 F.3d at 1356 (internal citations omitted). This includes instances where an action is "a substantial factor in bringing about the harm, and that the harm would not have occurred but for that action." *Shyface*, 165 F.3d at 1365 (internal citations omitted). The Federal Circuit has explained that in such cases, "while the vaccination must be a substantial factor in the [injury], it need not be the sole factor or even the predominate factor." *Pafford*, 451 F.3d at 1357.

In evaluating whether this prong is satisfied, the opinions and views of the vaccinee's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause-and-effect show[s] that the vaccination was the reason for the injury.'" (quoting *Althen*, 418 F.3d at 1280)). Medical records are generally viewed as trustworthy evidence, since they are created

contemporaneously with the treatment of the vaccinee. *Curcuras*, 993 F.2d at 1528. Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano*, 400 F.3d at 1325. Instead, Petitioner may satisfy her burden by presenting circumstantial evidence and reliable medical opinions. *Id.* at 1325–26.

A successful argument pursuant to *Althen* prong two is heavily dependent on a reliable causation theory. Petitioner's inability to meet her burden demonstrating how the meningococcal vaccine can cause SFN effectively precludes her from being able to show that her symptoms were actually caused by the vaccine according to said theory. This hinders any meaningful discussion on prong two.

Although treating providers can be very helpful in determining chronology and diagnosis in many cases, they often lack the education, training and/or experience in immunology to opine about a patient's disease etiology. Often, medical records will include a physician's note that etiology is unknown due to many factors, including a patient's delay in seeking treatment, the presence of comorbidities, the lack of known causes, or occasionally, misdiagnosis. Here, Petitioner's treaters did offer opinions on the cause of her condition, but they provided little, if any explanation for their conclusions.

As noted earlier, when Petitioner reported her initial symptoms of muscle soreness, stiffness, and headache to Dr. Levine, she opined that Petitioner had suffered an adverse reaction to her vaccination, but her impressions ranged from an allergic reaction to chronic fatigue syndrome and nonspecific autoimmune reaction. *See* Pet'r's Ex. 7. Dr. Levine attributed these symptoms to the vaccine but ultimately diagnosed Petitioner with aseptic meningitis. Indeed, these symptoms are not referenced by Dr. Latov to establish onset of SFN.

Dr. Berdia opined that Petitioner's condition is "likely neuropathy autoimmune, vaccine related," but Dr. Weimer was "very doubtful that she ha[d] an active or ongoing process." Pet'r's Ex. 2 at 59; Pet'r's Ex. 9 at 8. Dr. Berdia only noted Petitioner's complaints of nerve pain, shocks, and dizziness in her assessment. Pet'r's Ex. 2 at 59. She completed a neurological examination on March 3, 2015, with no abnormal findings and recommended MRI, EMG and NCS to rule out AIDP. All of these tests returned normal results, and Dr. Berdia did not discuss any additional factors that led to this opinion. Dr. Berdia's opinion evolved to specify that Petitioner suffered from SFN; however, there is nothing in the record that lends support for a vaccine-related etiology. Comparatively, Dr. Weimer could not rule out SFN but found "no signs of significant or detectable neurological deficits or neuropathy." Pet'r's Ex. 9 at 8.

Dr. Chin considered a vaccine etiology for Petitioner's SFN on August 10, 2017, based in part on a belief that Dr. Weimer had diagnosed Petitioner with SFN in May of 2015. Pet'r's Ex. 13 at 2–6. There is a note that the symptoms developed post vaccination, and an inflammatory etiology was questioned; however, Dr. Chin drew no conclusions on causation and instead sought to verify an SFN diagnosis.

As is such often the case, Petitioner's treaters were initially unsure how to characterize her constellation of symptoms. They all ultimately agreed on vaccine causation for her aseptic meningitis but were less confident in both the SFN diagnosis and its relationship to her vaccination. Dr. Levine's notes were the most definitive but lacked reasoning for her conclusions. Given that her expertise is not in immunology, and that she did not offer any biological mechanism for causation, I assign more weight to her opinion regarding diagnostics as opposed to etiology. Other treaters questioned the possibility of vaccine causation, but these contemplations seem to be based on the temporal relationship between Petitioner's vaccine and symptom onset, and the musings of other treaters hesitant to rule out neuropathy without further testing. While the medical record does suggest that the plausibility of meningococcal vaccine-induced neuropathy should be considered, it does not provide preponderant evidence of causation in Petitioner's case.

Petitioner's expert, Dr. Latov, agreed with Dr. Levine and provided an immunological basis for his opinion. Dr. Latov's molecular mimicry theory is underpinned by the assumption that (acute) SFN is a form of sensory GBS, and he relied primarily on Uncini & Yuki and Yuki et al. to support this argument. Uncini & Yuki was written in 2012, and the authors sought to better define sensory GBS, due to "reports [of] different clinical presentations and electrophysiological findings [that] are variously named," which caused "terminological and nosological confusion." Pet'r's Ex. 66 at 1. They explained that patients with "an acute small-fiber sensory neuropathy, increased [CSF], normal reflexes, and normal motor sensory conduction studies were believed to have a possible GBS variant." *Id.* Ten such ASFNG patients were reported to have experienced an acute onset of numbness or burning in their extremities that reached a peak in six weeks. *Id.* at 4. Petitioner did not have elevated CSF, nor did she experience a peak of numbness and burning within six weeks of symptom onset. In fact, Petitioner did not specifically complain of burning, but she reported cold and hot sensations. Petitioner asserted that these symptoms began on February 18, 2015, and she continued to complain of these symptoms, along with a shock feeling, nerve pain, and headaches during an August 17, 2016 examination, six months later. It is also notable that the patients described in the Uncini & Yuki study experienced a length-dependent pattern of SFN, while Petitioner's SFN was non-length dependent.

The authors ultimately opined that "the rapid onset, increased CSF protein level, and the disease course suggest that this disorder is related to GBS." Pet'r's Ex. 66 at 4. The authors went further, noting the possibility of "post-vaccination GBS involving small fibers," as five of the ten patients included in their study were from Souayah et al., a series of five case reports detailing the onset of SFN following rabies, varicella, and Lyme disease vaccinations. *Id.* The accounts of these patients provide support for a sensory SFN variant of GBS that may be associated with the vaccines identified. However, Petitioner does not match the presentations of the patients discussed. Further, the patients included by Uncini & Yuki from Souayah et al. developed SFN after receiving boosters for rabies, varicella, and Lyme disease vaccinations, not the one-dose meningococcal vaccine Petitioner received. *See* Pet'r's Ex. 62 at 1.

Patient One from Souayah et al. "received [the] rabies vaccine over three days within a one-week period[, and s]everal hours after the second injection, he developed burning paresthesias." Pet'r's Ex. 62 at 1. Patient Two "developed burning and itching sensations . . . one day after a [Lyme disease] vaccination" that incompletely resolved but "then returned more intensely one year later, immediately following a second LYMErix vaccination." *Id.* at 1–2.

Petitioner differs substantially from Patient One and Two, because her vaccine was not administered in multiple doses. Additionally, the symptoms that she developed within 24 hours of vaccination, headache and stiff muscles, were attributed to her aseptic meningitis diagnosis. Dr. Latov opined that Petitioner's SFN first manifested ten days post vaccination with her stinging and cold sensations. Tr. 95. Petitioner's mother also reported Petitioner was suffering from migraines and chills, but Dr. Latov testified that these symptoms are not specific for SFN. Tr. 97. Patient Three in Souayah et al. also received two Lyme disease vaccines, developing mild flu-like symptoms after the first one and "severe, sharp stabbing" chest pains "approximately one week after the second injection," administered one month later. *Id.* at 2. Patient Four's presentation was similar to Petitioner's in that she developed headaches and neck stiffness "a few days after receiving" vaccinations for Lyme disease and hepatitis A. However, her symptoms were directly linked to her subsequent neuropathy. Patient Four also later developed gastrointestinal symptoms, atrial fibrillation, leg edema and memory loss with fluctuated over a period of two months to six years. It is unclear if all of her symptoms were attributed to SFN. The final patient studied by Souayah et al. developed progressive "numbness and hyperesthesias in all extremities about two months following a second [varicella zoster] vaccine." *Id.*

These cases, involving different vaccines and symptoms following a second vaccine dose or multiple vaccines at once, do not provide a roadmap that is consistent with Petitioner's symptom onset: headache and neck stiffness immediately post vaccination in the context of aseptic meningitis; followed by chills, stinging pain, cold sensations, and dizziness with nausea approximately one week later. Petitioner's presentation differed substantially from all ten of the ASFNG patients reviewed by Uncini & Yuki, and the vaccinations differed substantially in their dosage, administration, and development. Dr. Latov did not explain why these differences would be inconsequential to any comparisons between Petitioner's case and those within the study. Without further explanation, I do not find that this article provides reliable evidence that Petitioner's SFN was a form of the sensory GBS the authors contemplated.

The second filed article that was authored by Dr. Yuki further undercuts Dr. Latov's efforts to analogize Petitioner's presentation to a sensory variant of GBS. Pet'r's Ex. 70. That article described three patients that presented with, among other things, impaired pinprick sensation, brush allodynia in a stocking-glove distribution, autonomic symptoms, normal NCS testing of their bilateral median, ulnar, peroneal, tibial sensory, and motor nerves, normal CSF, and decreased or absent deep tendon reflexes. *Id.* at 1–2. It is this description that most closely resembles Petitioner's symptoms. Petitioner experienced autonomic symptoms, normal NCS testing of bilateral median, ulnar, peroneal, tibial sensory, and motor nerves, normal EMG/NCS studies, and normal CSF, in addition to her reduced IENFD in her thigh. Despite a tendency by some to use "the term acute [SFN] to describe these patients and [propose] this as another variant of [GBS]," Dr. Yuki explained that the reduced reflexes "were likely a result of the spinal root inflammation common to [GBS]." *Id.* at 4. Consequently, such a presentation of acute SFN may "exhibit similarities to [GBS]," but is in fact "a different disease entity." *Id.* at 5. This conclusion runs counter to the argument that Petitioner's presentation should be considered a GBS variant consistent with the molecular mimicry and/or bystander activation mechanisms that Dr. Latov provided as the cause of Petitioner's SFN.

Petitioner's medical record includes suggestions by treaters that her complaints of sensory symptoms shortly after receipt of a meningococcal vaccine could be indicative of a relationship. This allowance for plausibility does not exempt Petitioner from meeting her evidentiary burden pursuant to *Althen* to provide a sound and reliable biological mechanism for SFN and a logical sequence of cause and effect to illustrate how her meningococcal vaccination led to the development of her condition. Without the former, Petitioner is usually unable to complete the latter, and this case does not deviate from that pattern. Petitioner has not provided preponderant evidence to establish but-for causation for SFN pursuant to *Althen* prong two.

As noted above, the consensus for the etiology of Petitioner's aseptic meningitis is her vaccination. The Fact Ruling established that these symptoms developed post vaccination, and her symptoms indicate a systemic, yet self-limiting disease. Dr. Bromberg asserted that Petitioner's aseptic meningitis was more likely the result of the meningitis outbreak on her college campus, but he is alone in this opinion. Indeed, Petitioner's treaters considered her symptoms (fever, pain, etc.) to be manifestations of an autoimmune reaction to the vaccine. Dr. Tompkins acknowledged that Petitioner exhibited symptoms of an inflammatory response to the vaccine, such as fever and aches and pains. Tr. 392: 1–4; Tr. 386: 9–11. Therefore, Petitioner has provided preponderant evidence that her meningococcal vaccination was the but-for cause of her aseptic meningitis, pursuant to *Althen* prong two.

Because Petitioner is unable to meet her burden pursuant to *Althen* prongs one or two with respect to her alleged condition, Respondent is under no obligation to provide any evidence of alternative causation for her symptoms. However, whenever Respondent's expert provides such evidence, it may be used to weigh the persuasiveness of Petitioner's evidence in support of vaccine causation. In this case, Dr. Tompkin's alternatives were with respect to Petitioner's symptoms and their cause. First, he sought to attribute Petitioner's development of the relevant symptoms in February 2015 to a prior upper respiratory infection. He did not provide much support for this assertion, nor did he discuss the decided period of time that had passed between Petitioner's upper respiratory infection and the development of her symptoms. Second, he opined that Petitioner's high B6 levels may be responsible for her SFN. This is curious because Dr. Tompkins denied that Petitioner suffered from any SFN, yet his explanation of her clinical presentation depends on her having that condition. In any event, it is of no consequence because the failure of Petitioner's theory does not turn on the acceptance of Respondent's opinions.

### D. *Althen* Prong Three

*Althen* prong three requires Petitioner to establish a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been defined as a "medically acceptable temporal relationships." *Id.* Petitioner must offer "preponderant proof that the onset of symptoms occurred within a time frame for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan*, 539 F.3d at 1352. The explanation for what is a medically acceptable time frame must also coincide with the theory of how the relevant vaccine can cause the injury alleged (under *Althen* prong one). *Id.*; *Koehn v. Sec'y of Health & Hum. Servs.*, 773 F.3d at 1239, 1243 (Fed. Cir. 2014); *Shapiro*, 101 Fed. Cl. at 542; *see Pafford*, 451 F.3d at 1358. A temporal relationship between a vaccine and an injury, standing alone, does constitute preponderant evidence of vaccine causation.

*See, e.g.*, *Veryzer v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 344, 356 (2011) (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that [P]etitioner must posit a medical theory causally connecting the vaccine and injury").

Dr. Latov relied exclusively on the Schonberger et al. article to establish that ten days is an appropriate temporal relationship between a meningococcal vaccination and SFN symptom onset. Given that there is not preponderant evidence Petitioner suffered from a sensory from of GBS (and, as discussed above, even if it was, the pathogenesis is different), no other evidence has been presented to support the timing. Consequently, Petitioner has not provided preponderant evidence that there is an appropriate temporal relationship between the onset of Petitioner's neuropathic symptoms.

Conversely, Petitioner's neck stiffness and headache developed the day after vaccination. There was no indication that this timeframe was too short (or too long) to link Petitioner's vaccination to her condition. Indeed, her treaters characterized these symptoms as an allergic reaction which would be expected immediately post vaccination. The medical records and Dr. Latov provide preponderant evidence of an appropriate temporal relationship between Petitioner's meningococcal vaccination and her aseptic meningitis.

## VIII. Conclusion

For the reasons discussed above, I find Petitioner has provided preponderant evidence to establish that she developed aseptic meningitis as a result of her meningococcal vaccine. However, she has not established by preponderant evidence that her meningococcal vaccine administered on February 8, 2015, caused her to suffer from SFN or sensory GBS, as alleged in her petition. Therefore, Petitioner is entitled to compensation, limited to any damages that arose as a result of her aseptic meningitis. Although Petitioner did not include her aseptic meningitis as a recoverable injury, special masters have the authority and are expected to consider the entire record and the totality of the circumstances to determine whether Petitioner has suffered an injury from vaccination. Here the record undoubtably provided evidence that she did. A separate damages order will issue.

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master